**GRAND TRAVERSE BAND OF OTTA-WA AND CHIPPEWA INDIANS,**
Plaintiff/Counter–Defendant,

v.

**UNITED STATES ATTORNEY FOR THE WESTERN DISTRICT OF MICHIGAN,** Defendant/Counter–Plaintiff,

and

**State of Michigan, Intervenor.**

No. 1:96–cv–466.

United States District Court,
W.D. Michigan,
Southern Division.

March 18, 1999.

Daniel P. Rogan, Vernie C. Durocher, Dorsey & Whitney, Minneapolis, MN, William Rastetter, Cedar, MI, John F. Petoskey, Suttons Bay, MI, for Grand Traverse Band of Ottawa and Chippewa Indians.

Edith A. Landman, Asst. U.S. Attorney, Jeffery J. Davis, Michael H. Dettmer, United States Attorney, Grand Rapids, MI, Michael Hayes Dettmer, U.S. Attorney, U.S. Attorney's Office, Grand Rapids, MI, for Office of the U.S. Attorney for the Western District of Michigan.

Keith D. Roberts, Asst. Atty. General, Jennifer M. Granholm, Attorney General, Lottery & Racing Division, Lansing, MI, for State of Michigan.

## OPINION

HILLMAN, Senior District Judge.

This is an action filed by the Grand Traverse Band of Ottawa and Chippewa Indians ("Grand Traverse Band" or "the Band") against the United States. The complaint seeks a declaratory judgment concerning the legality of the Class III gaming being conducted at Turtle Creek Casino, in Whitewater Township, by the Grand Traverse Band. The United States has filed a counterclaim seeking to declare the Turtle Creek facility illegal, to enjoin further gaming at the facility, and to remove and confiscate gambling devices. The State of Michigan also has been permitted to intervene as party defendant and to file a complaint seeking to declare the operations illegal and to enjoin gaming at Turtle Creek. The matter presently is before the court on a motion for preliminary injunction filed by the United States and a motion to continue a stay of proceed-

ings filed by the Band. Upon review, **I DENY** the government's motion for preliminary injunction and **GRANT** the Band's motion for stay.

## I. *BACKGROUND*

In August 1993, the Grand Traverse Band entered into a tribal-state gaming compact with the State of Michigan pursuant to the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2710, for Class III (casino-style) gambling on reservation lands. That compact was approved under the procedures of IGRA by the United States Department of the Interior. During the time the tribal compact was being negotiated, the Band had no gambling plans for the Turtle Creek site.

The Turtle Creek Casino was opened by the Grand Traverse Band on June 14, 1996. The casino is located on land that is not part of or contiguous to lands held in trust for the Band on October 17, 1988. The United States contends that Turtle Creek is operating unlawfully because the Indian Gaming Regulatory Act ("IGRA"), 25 U.S.C. § 2719, bars Class III gaming on lands taken into trust after October 17, 1988, unless that land meets one of the express exceptions of § 2719(a) or (b), all of which the United States contends are inapplicable here. As a result, the United States and the intervening State of Michigan assert that, under IGRA, the land was taken into trust after October 17, 1988, and therefore Class III gaming is barred absent compliance with the provisions of § 2719(b)(1)(A) requiring a determination by the Secretary, together with concurrence by the governor of the State of Michigan, that the facility would be in the best interests of the tribe and its members and not be detrimental to the surrounding community. No such approvals were obtained by the Band.

At the time this action initially was filed, the complaint sought declaratory judgment on the basis of reasoning contained in a decision by Judge McKeague in *Keweenaw Bay Indian Community v. United States,* 914 F.Supp. 1496 (1996), *rev'd,* 136 F.3d 469 (6th Cir.1998), *cert. denied,*.—— U.S. ——, 119 S.Ct. 335, 142 L.Ed.2d 277 (1998), which reviewed the applicability of § 2719(b)(1) in parallel circumstances and determined that the requirements of § 2719 did not apply to situations in which a valid tribal-state compact had been reached pursuant to § 2710. The government promptly moved for summary judgment on the applicability of § 2719, contending that the *Keweenaw Bay* decision was wrongly decided. The Band moved for a stay of proceedings pending the outcome of the appeal in the *Keweenaw Bay* decision.

Upon review, this court stayed proceedings pending appeal of the *Keweenaw Bay* decision, which was subsequently reversed by the Sixth Circuit in 136 F.3d 469 (6th Cir.1998). The Keweenaw Bay tribe's petition for writ of certiorari was denied on October 13, 1998.

At the time the court granted the stay in 1996, the Grand Traverse Band advised the court that, if the Sixth Circuit reversed Judge McKeague, the Band intended to amend its complaint to include a claim that the Turtle Creek property was within one or more exceptions to § 2719, because the property was within the Band's 1836 treaty lands. The Band indicated, however, that unless the *Keweenaw Bay* issue was overturned on appeal, it preferred not to invest the resources that would be required to prove the historical claim inasmuch as the legal issue would be moot. Following the Sixth Circuit's reversal of Judge McKeague's decision in *Keweenaw Bay,* this court held a status conference. The Band again expressed its intent to file an amended complaint, which the court allowed.

In its amended complaint, the Band asserts that the land on which Turtle Creek is situated is part of the Band's historical reservation, and thus outside the proscriptions of § 2719. Specifically, the Band contends that the Turtle Creek facility is

outside the scope of § 2719 because the land is "within or contiguous to the boundaries of the reservation of the Indian tribe on October 17, 1988," as provided in § 2719(a)(1). In addition, in response to the instant motion for preliminary injunction, the Band asserts that the land on which Turtle Creek lies was taken into trust as part of "the initial reservation of an Indian tribe acknowledged by the Secretary under the Federal acknowledgment process ...," as provided in § 2719(b)(1)(B)(ii). Finally, the Band argues that the Turtle Creek land was taken into trust as part of "the restoration of lands for an Indian tribe that is restored to Federal recognition ...," as provided in § 2719(b)(1)(B)(iii).

At the time of the last status conference, the parties represented that they believed they would come to agreement to hold future revenues of the casino in escrow pending development and resolution of the new historical claims under the statutory exceptions. If not, however, the government expressed its intention of filing a motion for preliminary injunction to bar gambling at Turtle Creek. Subsequently, the parties were unable to agree concerning the escrow arrangement, and the government filed a motion for preliminary injunction.

The government's motion for preliminary injunction presently is before the court, together with a related motion to strike the affidavit of plaintiff's expert. In addition, plaintiff Band has moved to continue the stay, pending resolution by the Supreme Court of the *Keweenaw Bay* case (which subsequently has been decided). Alternatively, the Band argues for stay because the IGRA grants primary jurisdiction over tribal gaming to the National Indian Gaming Commission ("NIGC"), which the tribe contends should be afforded the first opportunity to examine the issues in dispute.

### A. *Motion to Strike the Affidavit of James McClurcken*

In support of and opposition to the motion for preliminary injunction, both parties have introduced affidavits of experts. The government has moved to strike the affidavit of plaintiff's expert, James M. McClurcken, Ph.D, an anthropologist specializing in the ethnohistory of indigenous tribes in the Great Lakes region. Because the affidavit provides a substantial portion of the facts upon which the Band opposes the motion for preliminary injunction, the government's motion to strike must be considered before deciding the appropriateness of granting a preliminary injunction.

The government has moved to strike that portion of McClurcken's affidavit that offers an opinion about whether the Band is a "restored tribe" within the meaning of 25 U.S.C. § 2719(b)(1)(B)(iii). The government contends that McClurcken's testimony amounts to an opinion regarding a legal issue that is not properly admissible under Fed.R.Evid. 702.

Under Fed.R.Evid. 702, expert testimony is admissible under the following circumstances:

> If specific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert ... may testify thereto in the form of opinion or otherwise.

It is black letter that an expert is not allowed to give testimony on a purely legal question. *See Nieves–Villanueva v. Soto–Rivera*, 133 F.3d 92, 99 (1st Cir.1997). However, the proscription bars only opinions that purport to advise the jury of a specialized legal standard rather than the application of facts to terms having meaning within the ordinary vernacular. *See United States v. Sheffey*, 57 F.3d 1419, 1426 (6th Cir.1995). In addition, Fed. R.Evid. 704 expressly contemplates that experts will be allowed to offer opinions upon the ultimate question, which necessarily implies the application of law to facts. *Id.* at 1425.

■ More significantly, however, the rule is directed toward the admission of expert testimony directed *at a jury* on the theory that determination of the law is for the judge, and that the allowance of expert opinion on legal standards might confuse the jury. *See Nieves–Villanueva*, 133 F.3d at 99. In fact, each of the cases cited by the government specifically concerns the use of such evidence in a jury case. *See* Brief in Support of Motion to Strike at 4–7. Here, in contrast, the testimony is presented to this court, which is fully aware of its obligations to determine the law and unlikely to be confused about this obligation by the opinion of an expert.

In any event, the bulk of Dr. McClurcken's affidavit concerning the meaning of "restored" tribes outlines his familiarity with the Federal Acknowledgment Process ("FAP"); his familiarity with the historical definitions of "acknowledgment" and "recognition" as applied by the Bureau of Indian Affairs ("BIA") and as addressed in articles by experts; the absence of well-understood use of any specialized definition of "restored" by the BIA; the history of the relationship between the United States and the Band, together with the administrative termination of that relationship; and the common historical experience of two other Bands with a virtually identical relationship to the United States and the treatment of after-acquired lands by these tribes as "restored lands." Each of these subjects is properly the subject of expert opinion, and some of the source materials for the opinions are attached to the affidavit.

I conclude that Dr. McClurcken's affidavit properly provides evidence of a factual nature that is not barred by Rules 702 or 704. Regardless, however, the court, sitting as both trier of fact and law on this motion for preliminary injunction, is fully able to disregard the implication of any impermissible legal conclusion.

Accordingly, the government's motion to strike the affidavit of Dr. McClurcken is **DENIED**. The court will, however, disregard any implication of statutory interpretation contained in that affidavit.

## B. *Preliminary Injunction*

■ In determining whether to grant a motion for preliminary injunction, the court must consider the following four factors: (1) a strong or substantial likelihood of success on the merits; (2) the likelihood of irreparable injury if the preliminary injunction does not issue; (3) the absence of harm to other parties; and (4) the protection of the public interest by issuance of the injunction. *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Regional Transit Auth.*, 163 F.3d 341, 347 (6th Cir.1998); *Glover v. Johnson*, 855 F.2d 277, 282 (6th Cir.1988); *Frisch's Restaurant, Inc. v. Shoney's, Inc.*, 759 F.2d 1261, 1263 (6th Cir.1985). The factors "are not prerequisites to issuing an injunction but factors to be balanced." *Local 1099*, 163 F.3d at 347. In deciding whether to grant a preliminary injunction, the court must carefully consider each factor and balance those factors in exercising its equitable powers. *Frisch's Restaurant*, 759 F.2d at 1263. The moving party bears the burden of persuasion as to these factors. *Id.*

### 1. Substantial or Strong Likelihood of Success

In 1836, the "Ottawa and Chippewa nations of Indians" entered into a treaty with the United States. Article 2 of the treaty provided in relevant part:

> From the cession aforesaid the tribes reserve for their own use, to be held in common the following tracts for the term of five years from the date of the ratification of this treaty, and no longer; unless the United States shall grant them permission to remain on said lands for a longer period, namely: ... one tract of twenty thousand acres to be located on the north shore of Grand Traverse bay ....

The Band asserts that the Turtle Creek site lies on land originally part of the Band's 1836 reservation as described in the cited treaty provision. In support of that assertion, the Band has presented a variety of materials. For example, the Band has provided affidavits of Band leaders and members regarding the oral history of the Band, the significance of land resources at the site and the historical significance of the site and neighboring areas to the Band's history. In addition, the Band introduced a substantial affidavit from James M. McClurcken. Dr. McClurcken offers his opinion that the Turtle Creek facility is likely to be within or contiguous to the band's reservation under the 1836 treaty, in light of the general location of the reservation, combined with the historical significance of the area for subsistence uses by the Band.

Until just one week before oral argument on these motions and over two months after plaintiff's response to the motion for preliminary injunction, the government introduced no evidence to dispute the band's substantive claims that the land was either part of its reservation, was part of the initial reservation following acknowledgment, or was land restored to the tribe. On the eve of hearing, however, the government introduced the opinion of Helen Hornbeck Tanner, an ethnohistorian. Dr. Tanner opined, based on the treaties of 1836 and 1855, together with maps made by Henry Schoolcraft and Charles Royce, as well as original surveyor's maps compiled by J. William Trygg, that the Turtle Creek site did not lie within either the 1836 or 1855 treaty reservation. At the hearing, the court agreed to allow the government's untimely submissions, but it accorded the Band additional time to file supplemental briefs and evidence in response to the government's belated arguments.

The Band has now completed its response and has submitted an additional brief and affidavits. In its response, the Band introduced supplemental affidavits by the tribal attorney concerning the acquisition of the property, by a Band member concerning oral history of the particular site, and by Dr. McClurcken regarding the history of the reservation lands from the 1836 treaty and the evidence at this juncture which supports a conclusion that the reservation did not cease to exist either five years after the 1836 treaty in 1841, or at the time of the 1855 treaty. The supplemental McClurcken affidavit also criticizes Dr. Tanner's methodology, in particular her reliance solely upon secondary historical evidence in the form of maps. Dr. McClurcken himself states that no valid, historically verifiable opinion can be reached at this juncture without examination of extensive primary materials. In both his initial and supplemental affidavits he identifies the nature of the research required and the time required for that research.

The Band alleges that the materials presented support in various ways and to varying degrees the three bases under which the Band asserts an exemption to § 2719 approval procedures.

Sections 2719(a) and (b)(1) state in relevant part as follows:

**(a) Prohibition on lands acquired in trust by Secretary**

Except as provided in subsection (b) of this section, gaming regulated by this chapter shall not be conducted on lands acquired by the Secretary in trust for the benefit of the Indian tribe after October 17, 1988, unless—

(1) such lands are located within or contiguous to the boundaries of the reservation of the Indian tribe on October 17, 1988;

\*     \*     \*     \*     \*     \*

**(b) Exceptions**

(1) Subsection (a) of this section will not apply when—

(A) the Secretary, after consultation with the Indian tribe and appropriate State, and local officials, including officials of other nearby Indian tribes, de-

termines that a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community, but only if the Governor of the State in which the gaming activity is to be conducted concurs in the Secretary's determination; or

(B) land are taken in to trust as part of—

(i) a settlement of a land claim,

(ii) the initial reservation of an Indian tribe acknowledged by the Secretary under the Federal acknowledgment process, or

(iii) the restoration of lands for an Indian tribe that is restored to Federal recognition.

25 U.S.C. §§ 2719(a)(1), (b)(1).

Under the quoted terms of 25 U.S.C. § 2719(a), gaming is prohibited on lands acquired by the Secretary into trust for the benefit of an Indian tribe after October 17, 1988 until the land has met the approval requirements of § 2719(b)(1)(A), unless the land in question falls within one of the exceptions of § 2719. The Band contends that the Turtle Creek property is exempt from the requirements of § 2719(b)(1)(a) for the following three reasons:

(1) the land was "taken into trust as part of ... the restoration of lands for an Indian tribe that is restored to federal recognition." 25 U.S.C. § 2719(b)(1)(B)(iii).

(2) the land was "taken into trust as part of ... the initial reservation of an Indian tribe acknowledged by the Secretary under the federal acknowledgment process." 25 U.S.C. § 2719(b)(1)(B)(ii).

(3) the land is "located within or contiguous to the boundaries of the reservation of the Indian tribe on October 17, 1988." 25 U.S.C. § 2719(a).

Upon review, I conclude that the government has failed to demonstrate a basis for preliminary injunction under the Band's theory of restoration of tribal lands

under 25 U.S.C. § 2719(b)(1)(B)(iii). As a result of my conclusions regarding the restoration exception under § 2719(b)(1)(B)(iii), I need not address the Band's remaining assertions.

In order to determine whether the Band meets the restoration exception under § 2719(b)(1)(B)(iii), the court must first determine whether the Band is a "restored" tribe within the meaning of the provision, and second, whether the land was taken into trust as part of a "restoration" of lands to such restored tribe. Neither "restored" nor "restoration" is defined under § 2719(b)(1)(B)(iii).

Interpretation of a statute begins with the plain meaning of the language itself. *See Nixon v. Kent County*, 76 F.3d 1381, 1386 (6th Cir.1996). The dictionary provides the following principal definitions of "restore":

**1:** to give back (as something lost or taken away): make restitution of: return .... **2:** to put or bring back (as into existence or use) ..... **3:** to bring back or put back into a former or original state ....

*Webster's Third New International Dictionary*, p.1936 (G. & C. Merriam Co.1976). Similarly, the entry for "restoration" contains the following principal definition:

**1:** an act of restoring or the condition or fact of being restored: as **a:** bringing back to or putting back into a former position or condition: reinstatement, renewal, reestablishment ....

*Id.*

The Band asserts that, under the plain meaning of "restore" and "restoration," the Band must be considered a "restored tribe" under the statute. It is undisputed that the Band was recognized by the United States for the purpose of signing a series of treaties between 1795 and 1855. These treaties granted the band reservation lands and other compensation, and the Band continued to have government-to-government relationship with the United States until 1876. McClurcken Aff. No.

1 ¶¶ 6, 8. At that time, BIA officers improperly terminated the federal trust relationship by administrative action. The Band unsuccessfully attempted for over a century to re-obtain federal recognition. Finally, in 1980, a formal administrative acknowledgment procedure was implemented, and the Band was the first tribe to exercise that procedure. McClurcken Aff. No. 1 ¶¶ 6, 8.

The United States does not dispute the chronology of historical treatment of the Band. It contends, however, that the terms "restored" and "restoration" have an explicit meaning under the structure of statute, even if that meaning is not set forth in a dictionary definition or express statutory definition. The government asserts that the statute contains a separate exception in § 2719(b)(1)(B)(ii) for lands obtained by a tribe when it is "acknowledged" by the Secretary of the Interior through the federal acknowledgment process under 25 C.F.R. Part 83. The government therefore reasons that by the "plain meaning" of the statute, an "acknowledged" tribe under § 2719(b)(1)(B)(ii) may never be considered "restored" under § 2719(b)(1)(B)(iii). As a result, the government contends, "restoration" of an Indian tribe under § 2719(b)(1)(B)(iii) must apply only to a process of restoration by way of Congressional action or by order of the court, not by agency acknowledgment. In other words, the United States asserts that in order to give effect to both provisions, a distinction must exist between restoration under subsection (B)(iii) and acknowledgment under (B)(ii). Because the Band uncontestedly was acknowledged by the Secretary under subsection (B)(ii), the government contends that it may not be considered restored under subsection (B)(iii).

Thus, the government does not dispute the standard dictionary definitions of "restore" and "restoration." Instead, it asserts that the dictionary definitions should be narrowed to include only those acts of "restoration" that have been performed by Congress or the courts.

An exception to the maxim of statutory interpretation that words be given their ordinary meaning exists "[w]here words conflict with each other, whether the different clauses of an instrument bear upon each other, and would be inconsistent unless the natural and common import of words be varied, construction becomes necessary . . . ." *Sturges v. Crowninshield,* 17 U.S. (4 Wheat.) 122, 202, 4 L.Ed. 529 (1819), *quoted in Lyons,* 105 F.3d at 1069. The government's "plain meaning" argument rests on the principle of statutory construction requiring a court to interpret statutes as a whole and avoid constructions that would render words or provisions superfluous or meaningless. *See Lyons v. Ohio Adult Parole Auth.,* 105 F.3d 1063, 1069 (6th Cir.1997) (discussing need to give meaning to all terms) (implicit overruling on other grounds recognized in *Arredondo v. United States,* 120 F.3d 639 (6th Cir.1997)). *See also* Norman J. Singer, 2A Sutherland Statutes and Statutory Construction § 46.06 (5th ed.1992).

"[I]t is a 'fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it used.'" *Textron Lycoming Reciprocating Engine Division, AVCO Corp. v. United Automobile, Aerospace, Agricultural Implement Workers of America,* 523 U.S. 653, 118 S.Ct. 1626, 1629, 140 L.Ed.2d 863 (1998) (quoting *Deal v. United States,* 508 U.S. 129, 132, 113 S.Ct. 1993, 124 L.Ed.2d 44 (1993)). *Accord Cohen v. De La Cruz,* 523 U.S. 213, 118 S.Ct. 1212, 1217, 140 L.Ed.2d 341 (1998). Nevertheless, in the absence of actual conflict with surrounding terms, courts are reluctant to infer a legislative intent to use a secondary definition over the primary definition, much less one that has an extraordinary and specific meaning. *See Muscarello v. United States,* 524 U.S. 125, 118 S.Ct. 1911, 1915–17, 141 L.Ed.2d 111 (1998) (declining to use secondary defi-

nition of "carry" over primary definition in absence of clear legislative intent to do so).

> Departure from the language of the legislature and resort to judicially created rules of statutory construction is appropriate only in the "rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters . . . or when the statutory language is ambiguous." The plain meaning of the statute controls the court's interpretation in all other instances.

*Nixon,* 76 F.3d at 1386 (quoting *Kelley v. E.I DuPont de Nemours & Co.,* 17 F.3d 836, 842 (6th Cir.1994)).

■ In the instant case, the government seeks not only to urge a secondary meaning over a primary one, but to impose a procedural limitation on all dictionary definitions of the word. I find the government's argument to be unpersuasive for two reasons.

First, the government has failed to demonstrate that a consistent alternate definition of "restore" has been used to apply only to the restoration of Indian tribes through legislative or court action. Indeed, as the government itself acknowledges, Congress itself has used the words "restore" and "restoration" interchangeably with "reaffirm" and "recognize" in the course of its actions to restore recognition of previously recognized tribes. *See* Government's Supplemental Brief in Support of Motion for Preliminary Injunction and Brief in Opposition to Grand Traverse Band's Motion for Partial Summary Judgment (docket # 54), pp. 4–5 (citing imprecise language by government in multiple acts addressing the restoration or recognition of tribes). The government has pointed to no standard, accepted and exclusive Congressional use of the words "restore" and "restoration."

Instead, Congressional use of the words appears to have occurred in a descriptive sense only, in conjunction with action taken by Congress to accomplish a purpose consistent with the ordinary meaning of the words. In no sense has a proprietary use of "restore" or "restoration" been shown to have occurred.

Admittedly, the meaning of the provision excepting lands acquired for restoration of a tribe under subsection (b)(1)(B)(iii) must be distinguished in some fashion from the provision excepting lands acquired by way of acknowledgment of a tribe under subsection (b)(1)(B)(ii). However, no evidence exists that a distinction between the provisions may be recognized only by inferring a Congressional intent to create mutually exclusive categories by way of an extraordinary but unspecified definition of the terms.

Instead, applying the common definitions of the terms "restore" and "restoration" to the statute, subsection (b)(1)(B)(iii) does not swallow the interpretation of subsection (b)(1)(B)(ii). Instead, both of the exceptions appear to be intended to place tribes belatedly acknowledged or restored in the same or similar position as tribes recognized by the United States earlier in their history. The statute expressly provides that lands located within or contiguous to the tribe's reservation on the effective date of the IGRA are exempt from the procedures of § 2719(b). *See* 25 U.S.C. § 2719(a)(1). Tribes which are belatedly recognized or acknowledged, however, have not had the ability to have lands placed in trust by the Secretary for the purpose of establishing or preserving a reservation. As a result, the statute appears to allow belatedly recognized tribes to have lands exempted by way of certain other exceptions.

Use of the federal acknowledgment process referenced under subsection (b)(1)(B)(ii) is not limited to those tribes which previously had been recognized by the administrative agency and whose recognition was later taken away. Instead, the Secretary has authority to recognize tribes by virtue of a complex set of historical facts, which may or may not include prior express recognition by the United

States and the Secretary. *See* 29 C.F.R. § 83.7 (setting forth criteria for federal acknowledgment); McClurcken Aff. No. 1, Ex. E (summarizing examples of Indian tribes acknowledged and recognized for the first time under the FAP).

When seeking acknowledgment, the Band required a land base, in accordance with 25 C.F.R. Part 54 (now codified at 25 C.F.R. Part 83). Rastetter Aff. ¶ 5. The non-profit corporation then-acting as the Band's governing body had obtained a 99–year lease from Leleenaw County, with option to renew, on 147.4 acres which the county held in trust for the benefit of the tribe. Following acknowledgment on May 27, 1980, the tribe was required to pursue a lawsuit against the prior trustee, the non-profit corporation that had moved for acknowledgment, in order to obtain control over these leased lands. That control was finally obtained by court order on January 30, 1985. *Id.* at ¶¶ 6–7. At the time the acknowledgment process was used by the Band in the instant case, however, the size and location of the initial reservation land had no extra-acknowledgment consequences. Fully eight years after the Band was acknowledged under the process, the IGRA created an exemption for lands initially acknowledged by the Secretary. The government's interpretation of the exclusivity of the provision would impose an additional, unanticipated consequence of having used the acknowledgment process rather than Congressional action for obtaining recognition—that the tribe would be limited under the IGRA to the first land taken into trust following acknowledgment (12.5 acres in 1983).

Such a *post facto* consequence is unreasonable if Congress has not clearly expressed such an intent. I conclude that no such intent is apparent here. Instead, it is perfectly sensible that "acknowledged" and "restored" tribes may on occasion overlap. Acknowledgment is a specifically defined term under the IGRA, because the statute expressly references a federal administrative process, 25 C.F.R. Part 83, by which the agency acknowledges the historical existence of a tribe. In contrast, a tribe is "restored" when its prior recognition has been taken away and later restored. Those processes may overlap where, as in this case, the tribe was Congressionally recognized, but later lost such recognition in some fashion. But not all tribes acknowledged under the federal acknowledgment process could also be described as restored. It is readily apparent that a tribe may be acknowledged which had never previously been recognized. *See* McClurcken Aff. No. 1 ¶¶ 7–8 & Ex. D & E (discussing tribes never recognized before federal acknowledgment).

In other words, the words "acknowledged" and "restored" are separate and have spheres of independent meaning, but may nonetheless overlap in some instances. Absolutely nothing in the statute suggests that Congress prohibited such a result.

The undisputed history of the Band's treaties with the United States and its prior relationship to the Secretary and the BIA demonstrates that the Band was recognized and treated with by the United States, and that following such treaties, until 1872, the Band was dealt with by the Secretary as a recognized tribe. Only in 1872 was that relationship administratively terminated by the BIA. *See* McClurcken Aff. No. 1 ¶¶ 8–9. This history—of recognition by Congress through treaties (and historical administration by the Secretary), subsequent withdrawal of recognition, and yet later re-acknowledgment by the Secretary—fits squarely within the dictionary definitions of "restore" and is reasonably construed as a process of restoration of tribal recognition. The plain language of subsection (b)(1)(B)(iii) therefore suggests that this band is restored.

In addition, I note that the argument of the United States is at odds with the previously unmentioned third exception of § 2719(b)(1)(B). Subsection (b)(1)(B)(i) excepts from § 2719(b) procedures those lands taken into trust as part of "a settle-

ment of a land claim." If, as the government asserts, the exceptions were intended by Congress to be mutually exclusive, a tribe acknowledged by the Secretary which subsequently settled a land claim would implicitly be barred from asserting the exception of subsection (b)(1)(B)(i), despite the unequivocal and unrestricted language of the subsection excepting lands taken into trust as part of "a settlement of a land claim."

Taken together, I find no evidence of Congressional intent to establish mutually exclusive categories of exceptions under § 2719(b)(1)(B). I further find no basis for giving the terms "restored" and "restoration," as used in § 2719, anything other than their ordinary meanings. As a result, I find no basis in the language of § 2719 for adopting the government's specialized definition of the terms.

Moreover, even if the government's definition could be considered plausible, a conclusion I reject, the Band's construction of the statute is equally (indeed, more) plausible. The existence of a plausible construction more favorable to the Band must be given preference under principles of statutory construction as applied to statutes addressing Indians and the historic trust position of the United States. *See Bryan v. Itasca County,* 426 U.S. 373, 96 S.Ct. 2102, 48 L.Ed.2d 710 (1976) (stating canon of construction that ambiguities in statutes dealing with Indians should be construed in a manner that benefits the Indians).

█ Having concluded that the Band may be considered a restored tribe under the statute, the question remains whether the land at issue was "taken into trust as part of ... the restoration of lands for an Indian tribe that is restored to Federal recognition." The government contends that in order to be "part of ... the restoration of lands" to a restored tribe, some Congressional action is required beyond

the simple language of the exception. Otherwise, the government asserts, restored tribes will be placed in a comparatively advantaged position vis-a-vis tribes which were not restored, because all acquisitions of property subsequent to restoration, without limitation, will be excepted from the statute.

However, accepting the government's position that some limitation is required, nothing in the record supports the requirement of Congressional action. Given the plain meaning of the language, the term "restoration" may be read in numerous ways to place belatedly restored tribes in a comparable position to earlier recognized tribes while simultaneously limiting after-acquired property in some fashion. For example, land that could be considered part of such restoration might appropriately be limited by the factual circumstances of the acquisition, the location of the acquisition, or the temporal relationship of the acquisition to the tribal restoration.

As the Band has noted, opinions from the Office of the Solicitor to the Secretary of the Interior have concluded that the restoration of lands may be broadly construed. In two opinions, the Solicitor considered lands taken into trust following the reaffirmation of the Pokogon Band of Potawanami Indians and the Little Traverse Bay Band of Odawa Indians. Both bands had an essentially identical history to the Grand Traverse Band, and the Solicitor found that after-acquired lands were restored lands within the meaning of § 2719. *See* Ex. I & J to McClurcken Aff. No. 1. Having concluded that the tribes were restored, the Solicitor took a broad view of what constituted lands taken into trust as part of a restoration of lands within the meaning of § 2719(b)(1)(B)(iii). The Solicitor concluded that the lands at issue were part of a restoration simply on the basis that the lands at issue were within the twenty-county area ceded by the tribe to the United States.[1]

---

1. As I previously have discussed, the United States contends that these tribes are distin-

guishable from the Grand Traverse Band on the basis that they were "restored" by Con-

By the reasoning contained in the Solicitor's opinions, if a tribe is a restored tribe under the statute, any lands taken into trust that are located within the areas historically occupied by the tribes are properly considered to be lands taken into trust as part of the restoration of lands under § 2719. In other words, the solicitor's opinions reject the position of the United States in this litigation that it is improper to adopt an open-ended interpretation of what constitutes a restoration of lands under § 2719. Further, in light of the virtually identical history of these tribes with the Grand Traverse Band, reliance on the Solicitor's analysis is particularly appropriate. Treating similarly situated tribes in a similar manner is consistent with federal legislation that counsels against interpretations that distinguish among tribes in ambiguous circumstances. See 25 U.S.C. § 476(f) ("Departments of agencies of the United States shall not promulgate any regulation or make any decision or determination pursuant to the Act of June 18, 1934 (25 U.S.C. § 461 et seq., 48 Stat. 984) as amended, or any other Act of Congress, with respect to a federally recognized Indian tribe that classifies, enhances, or diminishes the privileges and immunities available to the Indian tribe relative to other federally recognized tribes by virtue of their status as Indian tribes.")

In addition, I note that the language of subsection (b)(1)(B)(iii) does not contain the same limiting language of subsection (b)(1)(B)(ii), which restricts the (B)(ii) exception to only those lands forming part of the "initial" reservation. Instead, the (B)(iii) exception requires only that the lands in issue to be part of "the restoration of lands for an Indian tribe that is restored to Federal recognition." That languages implies a process rather than a specific transaction, and most assuredly does not limit restoration to a single event.

In support of its argument that the parcel at issue may not be considered part of a restoration of lands, the United States has introduced an August 3, 1998, letter sent from the Office of the Solicitor to Congressman Fazio regarding the Mechoopda Tribe of the Chico Rancheria. See Ex. 6 to Govt's. Supplemental Brief. In that letter, the Solicitor takes the position that lands may not be considered "part of ... the restoration of land for an Indian tribe that is restored to Federal recognition" under § 2719(b)(1)(B)(iii). The letter advises that the exception under § 2719(b)(1)(B)(iii) cannot be read to include all lands thereafter taken into trust for a restored tribe. The Solicitor asserts that some additional authority must exist beyond § 2719(b)(1)(B)(iii) for designation of after-acquired land as "part of a restoration of land."

In response, the Band asserts that it is not claiming that any lands which are taken into trust necessarily amount to restored lands. It contends instead that in order to meet the requirements of the exception, the land must in some sense be said to be "restored." The Band asserts several ways in which the Turtle Creek

gress rather than by the Secretary in the acknowledgment process. I previously have concluded that the government's asserted distinction is not supportable on the language of the statute. I note in passing that the Solicitor's opinions regarding the Pokagon Band of Potawanami Indians and the Little Traverse Bay Band of Odawa Indians analyze whether a tribe is restored *not* by the specific language used by Congress, but by what historically occurred: "The common thread among all these statutes is that, before their enactment, the tribe was not included on the list of Federally Recognized Tribes published annually in the Federal Register. Inclusion on the list is a prerequisite to acknowledgment that the tribe has 'the immunities and privileges available to other federally acknowledged Indian tribes by virtue of their government-to-government relationship to the United States as well as the responsibilities, powers, limitations and obligations of such tribes.'" McClurcken Aff. No. 1, Ex. I at 7 (quoting 61 Fed.Reg. 58,211 (Nov.1996)). The Solicitor's analysis, therefore, is consistent with my own regarding the meaning of what constitutes a "restored tribe."

site is properly included within a more limited meaning of "restoration."

First, the Band contends that Turtle Creek undisputedly lies within the counties previously ceded by the Band to the United States, and thus is properly considered "restored." McClurcken Aff. No. 1 ¶ 28. The Solicitor's 1998 letter to Fazio fails to reveal whether the parcel at issue in the Mechoopda tribe case was originally part of lands ceded by the tribe. Thus, the Band contends the letter is not clearly in opposition to the Band's view.

Second, the Band asserts that at the time of its acquisition, the parcel was intended to be part of a restoration of tribal lands. *See* Supp.Aff. of William Rastetter at ¶¶ 8–11. It further asserts that the Turtle Creek property was part of the very earliest attempts to build a reservation by the newly acknowledged Band following ratification of its constitution. *Id.* Indeed, other than the leased land, which came to the Band's use in 1985, and title to the 12.5 acres, which was taken into trust in January 1983, the Band did not acquire any additional lands in trust until 1988. In fact, the Band's constitution was not approved by the Secretary until 1988. Between March 1988 and July 1990, the Band took into trust all of the multiple parcels of property currently held in the reservation. The subject property was taken into trust on August 8, 1989. As a result, the Band asserts that the land appropriately is considered part of a restoration both in time and in intent. *Id.* The Solicitor's letter does not discuss whether the Mechoopda tribe's parcel met such limitations.

Third, the Band contends that the Turtle Creek site is located within or contiguous to the land reserved to the tribe under the 1836 treaty with the United States. Therefore, the Band asserts, any acquisition of land within a former treaty reservation is appropriately considered a "restoration of lands" by "restored" tribes. The tribe contends that limiting of "restoration of lands" to prior treaty lands is completely consistent with the unbinding letter of

the Solicitor to Congressman Fazio because it requires some authority in addition to the provisions of § 2719(b)(1)(B)(iii).

I am not persuaded that the Solicitor's letter provides substantial evidence of a preferred interpretation of the statute's terms. First, the letter explicitly acknowledges that it is not a formal legal opinion. Second, as the Band notes, the letter provides no evidence that the lands that the Mechoopda tribe sought to have recognized as restored lay within lands previously occupied by the tribe.

In contrast, I am persuaded that the Band has introduced evidence which, if believed, supports a conclusion that the Turtle Creek site was part of a restoration of lands to a restored tribe. The Band has introduced evidence of the intent of the Band in acquiring properties between 1988 and 1990. In addition, it has introduced evidence supporting the temporal proximity of restoration of all reservation holdings to the time of acknowledgment and approval of the tribal constitution, together with the absence of any substantial restoration of lands preceding the property at issue. Most significantly, however, I conclude that the Band has introduced significant evidence that the parcel at issue may be located within the Band's 1836 reservation. Placement within a prior reservation of the Band is significant evidence that the land may be considered in some sense restored.

For all these reasons, I conclude that the government has failed to demonstrate a substantial likelihood of success in proving that the lands were not acquired as part of the restoration process. In particular, I reject as unpersuasive the present unsupported conclusions of the government's expert, Helen Hornbeck Tanner, regarding 1836 reservation boundaries. Professor Tanner's opinions regarding the boundaries of the reservation rest solely on secondary historical information con-

tained in admittedly inaccurate maps of the region.

The first map relied upon by Professor Tanner is a map which accompanied Indian agent Henry Schoolcraft's annual report in 1837. Consistent with the treaty provision, the map shows the reservation to be located on the "north" shore of Grand Traverse Bay, which all parties concede has no north shore, but instead runs north and south. The map is elongated and, by Tanner's own admission, the map "indicates the inaccuracy and lack of geographical knowledge of northwestern lower Michigan at that time." Tanner Aff. ¶ 5. Document 2. Nevertheless, Tanner contends that the map shows the reservation to be located in the area of the town of Eastport. She has not, however, offered any primary historical evidence that would support a conclusion that the parties intended the 20,000 acre reservation to be centered on Eastport. Further, no contemporaneous evidence has been offered which suggests that the Eastport area in any way was central or important to the Band.

Professor Tanner implicitly acknowledges the unreliability of an Eastport-centered treaty boundary and proceeds to emphasize the importance of Elk Rapids to the Band (which would fall outside an Eastport-centered reservation). She thus provides a second opinion based on the inclusion of Elk Rapids within the reservation. Again, however, Tanner has failed to supply evidentiary support other than speculation for the placement of reservation boundaries equidistant from Elk Rapids. She has simply concluded that a map "centered on" Elk Rapids would not include the Turtle Creek site.

Finally, Tanner points to a map by Charles Royce published in 1899, which purports to show the reservation as including only a small piece of land on the "north" (in actuality, the east) side of Grand Traverse Bay (ending approximately 1.5 miles from Turtle Creek), and showing the bulk of the reservation as lying on the Mission Peninsula, which extends up the center of Grand Traverse Bay. Such a location flatly contradicts Schoolcraft's map and is at odds with the treaty language itself. McClurcken advised in both of his affidavits that Royce had a poor reputation as a cartographer, a contention Tanner does not dispute.

Tanner's remaining testimony concerns her opinion that the Turtle Creek site is not situated within the boundaries of the 1855 reservation. The Band, however, has never so contended, and the point is not in dispute for the purposes of determining whether the property is within the 1836 treaty lands.[2]

As a result, Dr. Tanner's opinions regarding the boundaries of the reservation are self-contradictory. Dr. Tanner has provided no primary evidence that would support any of her proposed reservation boundaries. Moreover, Dr. Tanner's prior research has never involved establishing the boundaries of the Band's 1836 reservation.

In contrast, Dr. McClurcken has noted the arbitrariness of Dr. Tanner's proposed boundaries centered on either Elk Rapids or Eastport, and instead has identified the significance of lands south of Elk Rapids,

---

**2.** Whether the 1855 treaty terminated the 1836 reservation unquestionably is in dispute with respect to the Band's claim that the 1836 reservation continued to be a reservation for purposes of the exception under § 2719(a) (exempting from the § 2719 approval process those lands that were part of the Band's existing reservation in 1988). Because of my conclusions regarding the plausibility of the Band's claim under the restoration exception of § 2719(b)(1)(B)(iii), however, I need not and do not do not reach the question of whether the 1855 treaty completely foreclosed Band claims to the 1836 reservation, a subject of some considerable historical dispute. If the Turtle Creek property lies on land that at one time was reservation land under a treaty, I am persuaded it may plausibly be considered part of a restoration of lands, regardless of how that land ultimately may have been lost.

particularly including routes and swamp areas. McClurcken shows that maps reasonably may be drawn to include both Elk River and the subject parcel within a reservation of 20,000 acres. In addition, tribal members have provided affidavits concerning the oral history of the Band and the archeological significance of the area of Turtle Creek. *See* Affidavits of George Bennett, Jack Chambers and Pauline Barber. Dr. Tanner has completely failed to address these affidavits concerning the Band's oral history, and has failed to address the archeological records cited by McClurcken and William Rastetter. Instead, she relies solely upon surveyor notes that reflect no sugar bush, Indian village or cultivated field sites in the area of Turtle Creek.

On the evidence presented, I am persuaded that Professor McClurcken's criticisms of Dr, Tanner's methodology are well-founded. I therefore conclude that the government has failed to prove a substantial likelihood of success on the merits. At best, I conclude that the government has demonstrated that, when all of the facts are in, the Band *may* not persuade the court on a full factual record that Turtle Creek lies within the 1836 reservation and thus may not demonstrate that the Turtle Creek property is plausibly considered "restored" lands within the meaning of 25 U.S.C. § 2719(b)(1)(B)(iii). Such proofs are insufficient to demonstrate substantial likelihood of success on the merits.

As a result of my conclusion regarding the plausibility of the Band's restoration claim based on the 1836 treaty, I need not affirmatively decide at this juncture whether the Turtle Creek property may be considered part of a restoration of lands to a restored tribe on other grounds. I also need not decide whether the land may appropriately be considered excepted under the provisions of § 2719(a)(1) and § 2719(b)(1)(B)(ii).

**2. Irreparable injury to movant**

■ Although a finding that the moving party has not at this stage of the proceedings demonstrated that it is substantially likely to prevail on the merits is not a bar to the issuance of a preliminary injunction, the moving party must show at least " 'serious questions going to the merits *and* irreparable harm which decidedly outweighs any potential harm to the [opposing party] if an injunction is issued.' " *Frisch's Restaurant,* 759 F.2d at 1270 (quoting *In re De Lorean Motor Co.,* 755 F.2d 1223, 1229 (6th Cir.1985)).

■ In support of its claim of irreparable injury, the government asserts that where an injunction is authorized by statute, the agency to whom the enforcement right is entrusted is not required to show irreparable injury. It is sufficient, the government claims, to demonstrate a violation of the law. *See United States v. Diapulse Corp.,* 457 F.2d 25, 27 (2d Cir. 1972); *United States v. Richlyn Labs., Inc.,* 827 F.Supp. 1145, 1150 (E.D.Pa.1992) (violation of statute "implied finding that violations will harm the public and ought to be restrained if necessary"). As the Band notes, however, the presumption does not apply unless the government can show a substantial likelihood of success on the merits of the statutory claim. *United States v. Nutri-cology, Inc.,* 982 F.2d 394, 398 (9th Cir.1992). The government's claim on the second factor, therefore, at best turns on the strength of its claim on the first factor.

■ In addition, as plaintiff notes, an injunction is not required to issue simply because the action is alleged to be statutorily prohibited. *See United States v. Production Plated Plastics, Inc.,* 762 F.Supp. 722, 728 (W.D.Mich.1991), *aff'd,* 955 F.2d 45 (6th Cir.1992). Moreover, other courts have held that where gambling is permitted in a state, state statutes governing gambling do not implicate public welfare, but constitute mere regulation. *See California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 209–211, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987) (analyzing the distinction between prohibitory and regulato-

ry statutes governing Indian gambling in the context of other gambling being permitted in the state). Where, as in Michigan, a state operates a wide range of gambling sites and has a public lottery, the statutes must be principally viewed as regulatory. *Id.* at 211, 107 S.Ct. 1083. In fact, the question has been tacitly conceded by the government on the facts of this case. Where the government would have consented to allow the activity to continue if the tribe had agreed to an escrow arrangement, the court is hard-pressed to conclude that the continuation of gambling at the site will be detrimental to the public interest. Such an alternative implies that the only concern is with the financial consequences, not with the impact on the public welfare. Financial harms are not generally considered sufficient to warrant a preliminary injunction. *See Sampson v. Murray,* 415 U.S. 61, 90, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974).

Accordingly, I conclude that the government has failed to prove a sufficiently irreparable harm to warrant granting a preliminary injunction.

### 3. Harm caused by issuance of injunction

▇ The third factor, the balance of hardships caused by the preliminary injunction, also weighs against the government. Accepting as true that the government has an interest in enforcing the laws, the consequence of granting the preliminary injunction and shutting down the facility is to create substantial financial hardship to the Band, its members and employees. If the government does not ultimately prevail on its statutory claims, the Band not only will have been deprived of revenues for the intervening period but also would be faced with significant obstacles to restarting the facility. In addition, numerous families within and without the Band, who are employed by Turtle Creek, will have their livelihoods interrupted. Moreover, the Band has introduced evidence that a wide variety of social services

are funded by revenues from Turtle Creek. *See* Bennett Aff. ¶¶ 19–21. If the United States is ultimately unsuccessful on the merits, the intervening loss of vital services will have imposed a substantial and unnecessary hardship on a large group of individuals. In the absence of very clear likelihood of success on the merits, this factor cuts strongly against the injunction.

### 4. Public interest

▇ The final factor is the public interest. The government's argument again collapses upon its claim that the IGRA is being violated. It argues that since the IGRA and Michigan gaming laws are intended to protect the public health, safety and welfare, their violation is necessarily against the public interest. While statutes may in fact represent a legislative determination of the best means to protect the public interest, violation of any particular regulatory statute, such as this one, may or may not constitute a detriment to the public interest. In addition, the Band directs the court to the concomitant federal interest in promoting tribal self-sufficiency and self-government, plus the rather substantial contribution of the casino to the local economy, as evidenced by the public comment in support of the ongoing application for a "best interests" determination. The Band's position is supported by affidavits and is uncontradicted by the government. *See* Bennett Aff. ¶¶ 20–22. Taken together, I am persuaded that the government has failed to prove that the public interest weighs in favor of granting the injunction.

Accordingly, because I conclude that none of the four factors supports granting the preliminary injunction, the motion for preliminary injunction is **DENIED**.

### C. *Motion to Stay*[3]

The Band originally requested that this court stay the instant action pending reso-

---

3. Although the Band's motion was titled as a

motion to *continue* stay, I agree with the

lution of the *Keweenaw Bay* case in the Supreme Court. The petition for certiorari in *Keweenaw Bay* was denied on October 13, 1998. Therefore, the Band's first basis for imposing a stay has been rendered moot.

The Band has raised two additional bases for staying the instant action. First, the Band asserts that applications of the IGRA should be decided in the first instance by the National Indian Gaming Commission ("NIGC"). The Band claims that this court should find that the NIGC has primary jurisdiction over alleged violations of the IGRA, and that this court therefore should stay any further action pending decision by the NIGC in the first instance. Second, the band argues that staying the action also would allow the Band time to complete its application to the Secretary for approval of the site via the § 2719(d) procedures that the government contends are controlling. Because I am persuaded that the primary jurisdiction doctrine supports staying the instant action, I need not address the Band's second basis for issuance of the stay.

■ The primary jurisdiction doctrine permits federal courts to stay or dismiss actions over which they have jurisdiction pending resolution of issues within the special competence of an administrative agency. *See Reiter v. Cooper,* 507 U.S. 258, 268, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993); *Alltel Tennessee, Inc. v. Tenn. Public Serv. Comm'n,* 913 F.2d 305, 309 (6th Cir.1990). The doctrine typically is invoked in order that the court may benefit from the expertise and experience of the administrative agency and in order to obtain uniformity in application of the statute at issue. *See Alltel,* 913 F.2d at 309. In deciding whether to apply the doctrine, courts typically assess "whether the purposes of the doctrine, including uniformity and accuracy gained through administra-

tive expertise, will be especially furthered by invocation in the particular litigation." *United States v. Haun,* 124 F.3d 745, 750 (6th Cir.1997).

No court of which I am aware has previously concluded that the NIGC has primary jurisdiction to determine whether gaming sites constitute Indian lands as defined under the IGRA. The NIGC principally is charged with enforcing civil compliance with federal law governing gaming on Indian lands. *See* 25 U.S.C. § 2713. The agency's authority includes levying and collecting fines for violations of the Act, as well as temporarily or permanently closing a facility. *See* §§ 2705, 2706. Decisions by the NIGC are appealable to this court. § 2715(b).

In deciding whether to apply the doctrine in the instant case, I note plaintiff is the party that first brought its claim to this court, bypassing the NIGC until such time as it appeared expedient to use the commission. This fact counsels against a finding that a stay is appropriate. Nevertheless, the determination of whether to apply the primary jurisdiction doctrine should not be controlled solely by which party invokes the doctrine. Instead, application of the doctrine should turn on whether the purposes of the doctrine are served.

■ The doctrine of primary jurisdiction does not apply to the duties of all administrative bodies. Instead, in order to determine whether to apply the doctrine of primary jurisdiction, the court must evaluate: (1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory scheme that (4) requires expertise or uniformity in administration. *United States v. General Dynamics Corp.,* 828 F.2d 1356, 1362 (9th

government that the prior stay of this proceeding terminated when the Sixth Circuit reversed the *Keweenaw Bay* decision. Inasmuch as the instant motion raises new

grounds for a stay and the government has treated the motion as a motion for stay, I have addressed the motion as a second motion for stay.

Cir.1987). Here, the government contends that the only issue involves whether the Turtle Creek site is located within some exception to the requirements of § 2719(a). That determination is essentially a factual evaluation that the agency itself would delegate to the Department of Interior. *See* Government's Ex. A to Brief in Opposition to Stay: Schiff Affidavit. The government contends that any determination rests on findings of fact, not on the agency's specialized understanding of its own statute.

The NIGC is charged with interpreting and applying the IGRA to Indian lands used for gaming. *See Miami Tribe of Oklahoma v. United States*, 927 F.Supp. 1419, 1422 (D.Kan.1996) (holding that NIGC had authority to determine whether particular lands were within the tribe's jurisdiction for purposes of determining whether they constituted "Indian lands" within the meaning of the statute). As the government conceded at oral argument (Tr. at 60), the NIGC's determination, even if it ultimately relies on an opinion by the Department of the Interior, would be subject to review under the standards set forth under *Chevron, U.S.A. Inc. v. National Resources Defense Council*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under *Chevron*, unless the intent of Congress is clear, the court must defer to a reasonable interpretation of the statute by the agency. *Id.* at 842–43, 104 S.Ct. 2778. As I previously have noted, Congress did not define what constitutes "part of . . . a restoration of lands for a restored tribe. . . ." As a result, reasonable agency interpretation would be entitled to deference. In light of the clear goal of the IGRA to promote uniformity, the agency's determination could be of significant assistance to the court.

I acknowledge that the nature of the determination required in the instant case is distinct from many of the primary duties of the NIGC, which involve monitoring and setting the procedures under which gambling is conducted and oversight of compliance with such procedures. *See* § 2705

(setting forth powers of Chairman of NIGC) and § 2706(b) (setting forth powers of the Commission, including monitoring gaming, conducting background checks, inspecting premises, and auditing records of Class II facilities) and § 2710(d) (setting forth authority for Class III facilities). The government does not contend, however, that the determination is outside the authority of the NIGC.

To the contrary, the agency has been entrusted with the power to subpoena and depose witnesses, to order the production of documents and to punish violations of its authority with contempt powers. 25 U.S.C. § 2715. The NIGC also has the authority to make regulations to interpret and enforce the IGRA, a power it has exercised. *See United States v. Santee Sioux Tribe of Nebraska*, 135 F.3d 558, 561–63 (8th Cir.1998) (affirming NIGC determination that gaming by the tribe was in violation of the IGRA in the absence of a tribal-state compact and ordering the tribe to close the facility).

Moreover, the primary jurisdiction doctrine has been recognized in other circumstances involving federal agency authority to apply and interpret Indian law. For example, the courts have found and deferred to the primary jurisdiction of the BIA to recognize tribes. *See Golden Hill Paugussett Tribe of Indians v. Weicker*, 39 F.3d 51, 58–60 (2d Cir.1994).

■ I conclude that in this instance as well, the NIGC's determination of the factual and statutory issues will be of considerable assistance to this court. *Id.* at 60. I therefore am persuaded that while this court "retains final authority to rule on a federal statute, [it] should avail itself of the agency's aid in gathering facts and marshalling them into a meaningful pattern." *Id.* at 60.

Further, inasmuch as I have concluded that the government is not entitled to a preliminary injunction in light of the Band's plausible claim under § 2719(b)(2)(B)(iii), I am not persuaded

that deferral of this action will unreasonably delay a determination of the legality of the Turtle Creek facility. *See Golden Hill*, 39 F.3d at 60 (noting relevance to court of public interest in prompt decision). In fact, this court previously has acknowledged the need for lengthy research and discovery for determination of the historical claim, and the court has set discovery deadlines accordingly. I am not persuaded that review under the administrative process will be more time consuming than discovery and review in this proceeding. I conclude, therefore, that this matter should be stayed pending a determination by the NIGC of whether the Turtle Creek casino falls within one of the cited exceptions to § 2719.

■ However, I am persuaded that issuance of a stay is more appropriate and more judicially efficient than dismissal of the instant action. *See Golden Hill*, 39 F.3d at 60 (holding that stay more appropriate than dismissal where public interest is served by reasonably prompt adjudication of issues). The public interest would not be served by unreasonable delays in an administrative determination about the legality of the Turtle Creek facility. Therefore, if no agency determination is reached within 18 months, the government shall be permitted to file a motion for immediate determination by this court on the merits. The Band and/or the NIGC will then be permitted to demonstrate why or if the stay should be continued. *See Golden Hill*, 39 F.3d at 60–61 (concluding that if no agency ruling is made within reasonable time frame, agency or party benefitting from stay should be required to show why the stay should not be dissolved).

Accordingly, this litigation is stayed pending final determination by the NIGC of plaintiff's claims of statutory exception. Alternatively, should NIGC decision not be issued within 18 months of issuance of this opinion, the court will reconsider the stay upon motion by the United States for relief from stay.

## II. CONCLUSION

For the foregoing reasons, the motion of the United States to strike the affidavit of James McClurcken is **DENIED**. The motion of the United States for preliminary injunction is **DENIED**. The motion by the Grand Traverse Band for stay is **GRANTED**. Accordingly, this action is stayed until final determination by the NIGC of the plaintiff's claims of statutory exception to § 2719 or for eighteen months when, upon motion of the United States, the court will reconsider the stay.

## ORDER

In accordance with the opinion filed this date,

**IT IS ORDERED** that the motion of the United States to strike the affidavit of James McClurcken (docket # 55) is **DENIED.**

**IT IS FURTHER ORDERED** that the motion of the United States for preliminary injunction (docket # 31) is **DENIED.**

**IT IS FURTHER ORDERED** that the motion by the Grand Traverse Band for stay (docket # 38) is **GRANTED,** and this action is hereby stayed until final determination by the National Indian Gaming Commission of the plaintiff's claims of statutory exception to § 2719, or for a period of eighteen months from the date of this order when, upon motion of the United States, the court will reconsider the imposition of a stay.