TOMAC, Plaintiff,

v.

Gale A. NORTON, Secretary, U.S. Department of the Interior, et al., Defendants.

No. Civ.A. 01–0398(JR).

United States District Court, District of Columbia.

March 29, 2002.

Rebecca A. Womdeldorf, Joe G. Hollingsworth, Stephen A. Klein, Spriggs & Hollingsworth, Washington, DC, William C. Fulkerson, Daniel K. DeWitt, Robert J. Jonker, Daniel P. Ettinger, Warner Norcross & Judd, LLP, Grand Rapids, MI, for plaintiff.

Frances M. Zizila, Indian Resources Section/ENRD, U.S. Department of Justice, Washington, DC, for defendants.

Reid Peyton Chambers, Sonosky, Chambers, Sachse, Endreson & Perry, Washington, DC, David Michael Peterson, Butzbaugh & Dewane, P.L.C., St. Joseph, MI, Harold George Schuitmaker, Schuitmaker, Cooper & Schuitmaker, Paw Paw, MI, for Amici Curiae New Buffalo Township, Michigan and City of New Buffalo, Michigan.

## *MEMORANDUM*

ROBERTSON, District Judge.

In this suit, plaintiff Taxpayers of Michigan Against Casinos (TOMAC) challenges a decision by the Bureau of Indian Affairs to take land into trust so that the Pokagon Band of Potawatomi Indians can build a casino. Several motions are pending. For the reasons set forth below, defendants' motion to dismiss or in the alternative for summary judgment will be granted in part and deferred in part. Plaintiff's motion for discovery pursuant to Fed.R.Civ.P. 56(f) will be denied. Defendants' motion to move the case to Michigan will be denied. The accompanying order sets a date for further oral argument on the remaining claims in the case.

### Background

The federal government recognized the Pokagon Band of Potawatomi Indians until the 1930s, when the Department of the Interior administratively stopped recognizing tribes on Michigan's lower peninsula and ceased providing services and benefits to them. In 1994, Congress reaffirmed the Pokagon's status and services, and it authorized the taking of land in trust for the Band but allocated no funds for that purpose. 25 U.S.C. §§ 1300j *et seq.* As an economic development project to fund further land purchases and tribal services, the Band now plans to build a 400,000 square foot complex that will include a 24–hour–a–day casino, a large hotel, a child care facility, and several restaurants and shops. The Pokagon expect to offer Class

II and III gaming under the Indian Gaming Regulatory Act (IGRA) and to attract 4.5 million customers per year. The project is sited on the 675 acre tract in New Buffalo Township, Michigan, that the Bureau of Indian Affairs intends to take into trust.

The casino site is located just off an interstate highway in a tourism region. Local governments in the area expect to receive significant revenues through cooperation agreements with the Pokagon. Some residents oppose the casino, however, arguing that it will hurt the quality of life in surrounding communities. They have filed this suit, acting through TOMAC, and they have sued in a Michigan state court to challenge a gaming compact between the State of Michigan and the Pokagon.

The Bureau of Indian Affairs decision to take the casino site in trust for the Band appears to have been fast-tracked at the end of the Clinton Administration, with the issuance of a final environmental assessment and a "finding of no significant impact" (FONSI) under the National Environmental Policy Act (NEPA) coming less than a month after the close of comments on an initial draft environmental assessment. The parties have stipulated, however, that final action taking the land in trust would be stayed pending the outcome of this case.

Defendants moved to transfer the case to the Western District of Michigan, and (before that motion was decided) moved to dismiss or in the alternative for summary judgment. The State of Michigan and the Township and City of New Buffalo filed amicus briefs in support of the dispositive motion. Near the end of the briefing period, plaintiff moved for discovery pursuant to Rule 56(f), asserting that defendants had failed to provide a complete administrative record and had acted in bad faith.

## Analysis

### I. Motion to Dismiss or in the Alternative for Summary Judgment

TOMAC brings four claims against the Department of Interior: (1) that placing the land in trust violates the Administrative Procedure Act (APA) because the Department lacks jurisdiction to place land in trust for an illegal activity (gambling without a valid compact), is acting arbitrarily and capriciously, and is failing to follow its own regulations; (2) that the environmental assessments, FONSI, and failure to complete a full environmental impact statement violated NEPA, Department regulations, and the APA; (3) that the Pokagon restoration act, 25 U.S.C. § 1300j–5, violates the nondelegation doctrine by failing to establish meaningful standards for taking land in trust; and (4) that placing the land in trust violates the APA because the defendants have failed to comply with procedures required by the Indian Gaming Regulatory Act.

Defendants' motion to dismiss argues that TOMAC lacks constitutional and prudential standing and makes individual arguments regarding each cause of action. I conclude that TOMAC does have standing, but that the claims asserting violations of the nondelegation doctrine and of the Indian Gaming Regulatory Act (Counts Three and Four above, and part of Count One) fail to state a claim upon which relief can be granted and must be dismissed.

### A. Standing

■ An organization has standing to sue on behalf of its members if "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash-*

*ington State Apple Advertising Comm'n,* 432 U.S. 333, 343, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). Defendants challenge TOMAC's standing on the first two elements.

### 1. Would individual TOMAC members have standing in their own right?

 An individual has constitutional standing if (1) she has suffered the invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent; (2) her injury is "fairly traceable" to the challenged action of the defendant and not the result of independent action by a third party not before the court; and (3) a favorable decision would "likely" redress the injury. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (internal quotations and citations omitted). Prudential standing is established by showing that the interest the plaintiff seeks to protect arguably falls within the zone of interests to be protected or regulated by the statute at issue. *Association of Data Processing Serv. Orgs., Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

### a. Constitutional standing

 In a case like this one alleging procedural violations, the requisite showing of injury requires a demonstration that the challenged act performed with improper procedures will cause a distinct risk to plaintiff's particularized interests. *Florida*

*Audubon Soc. v. Bentsen,* 94 F.3d 658, 664 (D.C.Cir.1996) (en banc). However, the normal standards for redressability and immediacy are relaxed, so that, for instance, "one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years." *Lujan,* 504 U.S. at 572 n. 7, 112 S.Ct. 2130.

 Here, several TOMAC members who live within a few blocks of the casino site assert interests in viewing local wildlife, walking in their neighborhood, and enjoying their own properties that are at risk of injury from a 24–hour–a–day casino attracting 4.5 million customers per year.[1] *Animal Legal Defense Fund, Inc. v. Glickman,* 154 F.3d 426, 432–33 (D.C.Cir.1998) (en banc) (personal, individual injury to aesthetic and recreational interests satisfies standing requirements); *Moreau v. Federal Energy Regulatory Comm'n,* 982 F.2d 556, 565–66 (D.C.Cir.1993) (adjacent property owners' assertions of aesthetic injury and safety hazards satisfies standing requirements). The fact that other TOMAC members assert economic injury from the competition they expect from casino restaurants and related businesses does not negate their standing to sue under NEPA. *Mountain States Legal*

---

1. Defendants argue that the casino will not actually damage the TOMAC neighbors' interests because it has been well designed and all relevant environmental factors have been considered in the NEPA process. This argument gets well into the merits of the case, however. Unlike *Florida Audubon Society,* in which plaintiffs predicted that an ethanol tax credit would increase agricultural cultivation, which would in turn damage particular wildlife habitats that they enjoyed, TOMAC members are immediately adjacent to a specific development project that will significantly and permanently alter the physical environment of their neighborhood. They are more like the landowner adjacent to the dam described in *Lujan,* 504 U.S. at 572 n. 7, 112 S.Ct. 2130, and they have sufficiently demonstrated a "geographic nexus to [the] asserted environmental injury." *Florida Audubon Soc.,* 94 F.3d at 668.

*Found. v. Glickman,* 92 F.3d 1228, 1235–36 (D.C.Cir.1996).

The issue of traceability is more complicated because the injuries asserted by TOMAC members arise, not directly from the challenged act of placing the land in trust, but rather from the intended use of the land by the Pokagon, who are not before the court. *Florida Audubon Soc.,* 94 F.3d at 668–70 (in NEPA violation cases, plaintiffs must demonstrate a causal link between the improper environmental assessment and a substantive decision that may have been wrongly decided as well as a link between the substantive decision and the plaintiffs' injuries). The necessary linkage is easy to identify, however. TOMAC members' injuries due to operation of the casino are traceable to the Bureau's actions, because the taking of the site in trust is a necessary prerequisite to both Class II and III gaming, 25 U.S.C. § 2710(b)(1), (d)(1), *see Animal Legal Defense Fund,* 154 F.3d at 440 (causation element satisfied where agency action authorizes conduct that would be illegal otherwise), and because taking the land into trust would give the Pokagon authority to compel the State of Michigan to negotiate over Class III gaming, *Kansas v. United States,* 249 F.3d 1213, 1223–24 (10th Cir. 2001); *Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Engler,* 173 F.Supp.2d 725, 727 (W.D.Mich.2001); *see also Bennett v. Spear,* 520 U.S. 154, 168–69, 117 S.Ct. 1154, 137 L.Ed.2d 281 (1997) (causation element satisfied where biological opinion had "determinative or coercive effect" on other government agen-

cies' actions).[2] These factors not only establish that the individual TOMAC members' injuries would be "fairly traceable" to the defendant's actions, but they also help to satisfy the redressability requirement—since a decision *not* to take the land in trust would prevent the Pokagon from building a casino on that site and from satisfying the requirements of IGRA for casino gambling.[3]

### b. Prudential standing

The requirement that the interests of individual plaintiffs fall within the zone of interests protected or regulated by the statutes at issue is "not meant to be especially demanding" and does not require that a particular plaintiff be the intended beneficiary of the act. *Clarke v. Securities Indus. Ass'n,* 479 U.S. 388, 399–400, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987). The test excludes only plaintiffs whose interests are "so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* The focus is "not on those who Congress intended to benefit, but on those who in practice can be expected to police the interests that the statute protects." *Mova Pharm. Corp. v. Shalala,* 140 F.3d 1060, 1075 (D.C.Cir.1998).

The "marginally related" test acknowledged in *Clarke* is a useful tool for explaining the difference between this case and *Grand Council of the Crees v. Federal Energy Regulatory Comm'n,* 198 F.3d 950, 959 (D.C.Cir.2000), upon which defendants rely for the proposition that TOMAC

---

**2.** Defense counsel also stated at oral argument that the NEPA evaluation focused specifically on the land's intended use as a casino and that the evaluation would be used both by the Bureau in determining whether to take the land into trust and by the National Indian Gaming Commission in approving any gaming applications by the Pokagon. Tr. at 8–9, 23–25, 60.

**3.** There are other means of qualifying a site as "Indian lands" eligible for gaming besides taking it into trust, 25 U.S.C. § 2703(4), but defense counsel stated at oral argument that the other alternatives would not come into play in this case. Tr. at 24.

members lack standing to bring their NEPA claims. In *Crees*, the claim was that a license granted by FERC to a Canadian electric utility to sell power within the U.S. at market-based rates would "devastate the lives, environment, culture and economy of the Crees" in northern Quebec because it would lead to the construction of new hydroelectric facilities which in turn would "destroy fish and wildlife upon which Cree fishermen, trappers and hunters depend." *Id.* at 954.

The Court of Appeals might have concluded that the interests of Canadian native fisherman, trappers, and hunters—in preserving the fish and wildlife they were afraid might be destroyed at some time in the future, if the sale of electricity at market rates were so wildly successful as to cause a proliferation in the construction of power plants in Quebec—were too "marginally related" to the purposes of NEPA to permit suit, *Clarke*, 479 U.S. at 399–400, 107 S.Ct. 750, or that the threatened injury was simply too speculative and remote to be fairly traced to a ratemaking decision, *Florida Audubon Soc. v. Bentsen*, 94 F.3d 658, 667–70 (D.C.Cir.1996) (en banc). That, however, would have been too easy—or, perhaps, too much like "we know it when we see it"—so, instead, the Court of Appeals reasoned (a) that because NEPA's requirement that environmental impact statements be performed for "major Federal actions" significantly affecting the human environment is "purely procedural," the zone of interests test must focus on the substantive statute under which the agency is acting;[4] (b) that FERC does not and need not consider environmental concerns in the exercise of its ratemaking authority (presumably because, indeed, ratemaking decisions are too "marginally related" to the environment!); and (c) the Crees, who did not complain of "informational injury," were not "suitable challengers" of FERC's failure to prepare an environmental impact statement. *Id.* at 955, 959.[5]

4. *Crees'* quotation from the Supreme Court's opinion in *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 333, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989), concerning the procedural nature of the statute is from the syllabus. The opinion does indeed state that if an agency adequately identifies and evaluates adverse environmental effects of a proposed action, NEPA does not mandate particular substantive results or prevent the agency from deciding that other values outweigh the damages. 490 U.S. at 350, 109 S.Ct. 1835. But the opinion also recognizes that NEPA contains " 'agency-forcing' procedures that require that agencies take a 'hard look' at environmental consequences" by requiring agencies to compile and carefully consider detailed environmental information and to provide a springboard for public comment. *Id.* at 349–50, 109 S.Ct. 1835 (internal quotations and citation omitted).

5. *Crees* appears to treat prudential standing under NEPA the same as prudential standing under the APA. The en banc decision in *Florida Audubon Society*, however, illustrates that the two are distinct. APA standing analysis looks to whether a plaintiff's interests are protected by the substantive statute under which an agency acts. *Armstrong v. Bush*, 924 F.2d 282, 287 (D.C.Cir.1991). Because NEPA does not provide a private cause of action, the appellants in *Florida Audubon Society* were seeking to enforce the environmental impact statement requirement under the APA. "In order to invoke judicial review of an alleged NEPA violation under the APA, a private individual must be 'adversely affected or aggrieved ... within the meaning' of NEPA by some final agency action. To be adversely affected within NEPA, appellants must at least demonstrate that they can satisfy all constitutional standing requirements *and that their particularized injury is to interests of the sort protected by NEPA*." *Florida Audubon Soc.*, 94 F.3d at 665 (emphasis added) (citations omitted). Thus, as the court recognized, NEPA protects interests independently of the substantive statute under which an agency takes a "major Federal action[ ] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).

However circuitous the route taken by the Court of Appeals in *Crees,* it does not lead to the result for which defendants contend here. In this case, opinions such as *Mountain States Legal Foundation v. Glickman,* 92 F.3d 1228, 1236 (D.C.Cir. 1996), and *Oil, Chemical & Atomic Workers International Union, AFL—CIO v. Pena,* 18 F.Supp.2d 6, 21 (D.D.C.1998), provide a much shorter, and straighter, path to standing: TOMAC members who live adjacent to or who enjoy recreation on land slated for changes in physical development fall well within the zone of interests protected by NEPA because, unlike the Canadian natives in *Crees,* they can fairly be expected to police environmental policies. *See also Concerned About Trident v. Rumsfeld,* 555 F.2d 817, 822–23 n. 10 (D.C.Cir.1976) (individual residents and groups representing individual residents living near site of proposed submarine facility); *Randolph Civic Ass'n v. Washington Metro. Area Transit Auth.,* 469 F.Supp. 968, 969–70 (D.D.C.1979) (residents near proposed bus garages).

Standing to present TOMAC's other APA claims requires a showing that its members' interests arguably fall within the zone of interests to be regulated by the underlying substantive law, *i.e.,* the Indian Gaming Regulatory Act and the Department's land-in-trust regulations. *Armstrong v. Bush,* 924 F.2d 282, 287 (D.C.Cir. 1991). Although neither IGRA nor the regulations create a cause of action for private parties, IGRA provides for the consideration of effects on surrounding communities and the regulations provide for consideration of land use conflicts and NEPA requirements. 25 U.S.C. § 2719(b)(1)(A); 25 C.F.R. §§ 151.10(f),

(h), 151.11(a). TOMAC members are precisely the type of plaintiffs who could be expected to police these interests.

## 2. Are the interests TOMAC seeks to protect germane to its purposes?

The defendants assert that the aesthetic and environmental interests TOMAC seeks to protect under NEPA are not germane to the purposes set forth in its articles of incorporation—"[t]o educate, inform and distribute information with regard to casino gambling in the Township of New Buffalo, Berrien County, State of Michigan." Def. Reply Exh. 1 at 1. The defendants also point to a website at which TOMAC and two other groups focus on the economic and social impacts—but not the aesthetic and environmental impacts—of casino gaming. Def. Reply Exh. 3.[6]

 Germaneness requires "mere pertinence between litigation subject and organizational purpose." *Humane Society of the United States v. Hodel,* 840 F.2d 45, 58 (D.C.Cir.1988). The requirement should be "undemanding," because mandating centrality of purpose "would undercut the interest of members who join an organization in order to effectuate 'an effective vehicle for vindicating interests that they share with others.'" *Id.* at 58, 56 (quoting *International Union, UAW v. Brock,* 477 U.S. 274, 290, 106 S.Ct. 2523, 91 L.Ed.2d 228 (1986)). Organizations may not pursue the claims of individual members that are wholly unrelated to the purposes of the organization, but germaneness requires only that "an organization's litigation goals be pertinent to its special expertise and the grounds that bring its membership together." *Id.* at 56–58. Indeed,

**6.** Defendants also assert that TOMAC's focus on protecting the "quality of life" of New Buffalo is merely a post hoc response to their motion to dismiss and argue that an organizational purpose should be determined at the time of filing to avoid such rationalizations. But TOMAC's description of its purpose was in fact set forth in the group's verified complaint at the time TOMAC initiated its lawsuit.

litigation that merely "aims to enhance the [organization]'s success in its central missions" is sufficiently germane. *Hotel & Restaurant Employees Union, Local 25 v. Smith*, 846 F.2d 1499, 1503–04 (D.C.Cir. 1988).

The Court of Appeals has drawn on a number of different sources to determine organizational purposes, including not only articles of incorporation, *Hazardous Waste Treatment Council v. EPA*, 861 F.2d 277, 285–86 (D.C.Cir.1988), but also affidavits by organization founders, *Committee for Effective Cellular Rules v. FCC*, 53 F.3d 1309, 1315 (D.C.Cir.1995), and the parties' briefs and complaint, *Albuquerque Indian Rights v. Lujan*, 930 F.2d 49, 53–54 (D.C.Cir.1991). I conclude that TOMAC's description of its purpose in its verified complaint is an accurate statement of its interests and the interests of its members as local residents concerned about a wide variety of casino impacts on quality of life and business. In seeking to compel more detailed environmental analyses and ultimately to block the Bureau's action in taking land into trust, TOMAC's litigation goals are designed to enhance its central missions and satisfy the requirement of germaneness.[7]

## B. Nondelegation Claim

▮▮▮ Defendants are entitled to summary judgment on TOMAC's nondelegation claim. As long as "intelligible principles" can be discerned from statutory text, legislative history, and historic context, Congress may delegate its legislative powers to administrative agencies under broad standards. *Mistretta v. United States*, 488 U.S. 361, 372–73, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989); *National Ass'n of Broadcasters v. Copyright Royalty Tribu-*

*nal*, 675 F.2d 367, 376 n. 12 (1982). The Supreme Court has struck down statutes on nondelegation grounds only twice in the last sixty-five years, *Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 474, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001), and this is unlikely to be the third. Plaintiff's reliance on an Eighth Circuit case concerning the taking of land in trust under the Indian Reorganization Act is not persuasive. *South Dakota v. Department of Interior*, 69 F.3d 878 (8th Cir.1995), *vacated and remanded*, 519 U.S. 919, 117 S.Ct. 286, 136 L.Ed.2d 205 (1996). Even if the *South Dakota* case were controlling in this Circuit, it concerns a different statute and its reasoning actually supports the conclusion that the delegation made in this case is permissible.

TOMAC's arguments that the Secretary has been given unconstitutionally broad powers hinge upon a single sentence of the Pokagon restoration act:

> The Band's tribal land shall consist of all real property, including the land upon which the Tribal Hall is situated, now or on and after September 21, held by, or in trust for, the Band. *The Secretary shall acquire real property for the Band.* Any such real property shall be taken by the Secretary in the name of the United States in trust for the benefit of the Band and shall become part of the Band's reservation.

25 U.S.C. § 1300j–5 (emphasis added). TOMAC views this sentence in isolation, without taking into account the rest of the statute and its legislative history. The restoration act provides generally that the Indian Reorganization Act and other Indian laws shall apply to the Pokagon "[e]xcept as otherwise provided in this subchap-

---

**7.** Plaintiff also argues that an environmental impact statement would provide information for TOMAC to distribute, but the D.C. Circuit looks unfavorably on such "informational standing" claims under NEPA. *See, e.g., Foundation on Econ. Trends v. Lyng*, 943 F.2d 79, 84–85 (D.C.Cir.1991).

ter." 25 U.S.C. § 1300j–1. Although the IRA has land acquisition provisions of its own, the Pokagon act provides the much more specific directive in § 1300j–5, affirms the Band's jurisdiction on trust lands "to the full extent allowed by law," *id.* § 1300j–7, and defines a larger ten-county service area in southwestern Michigan and northern Indiana, *id.* § 1300j–6.

The legislative history emphasizes that Band members continue to form a distinct community within their ancestral homelands in the St. Joseph River valley, particularly in the Silver Creek Township where they already own the Tribal Hall and other property. S.Rep. No. 103–266, at 1, 5 (1994); H.Rep. No. 103–620, at 1, 6 (1994). It also notes that the Office of Indian Affairs had begun searching for a reservation site in the 1930's, but then did not permit the Pokagon to complete the organization process, in part because funding ran out. S.Rep. No. 103–266, at 3–4; H.Rep. No. 103–620, at 4–5. The purpose of the new legislation, the Senate explained, was to "strongly affirm[ ] that the trust responsibility [of] the United States is not predicated on the availability of appropriated funds. Further, the possession of a tribal land base is not the foundation for determining tribal status." S.Rep. No. 103–266, at 6.

The words of the statute and their legislative history demonstrate that Congress intended the Secretary to help establish a reservation land base in a specific geographic area by taking Pokagon-owned lands in trust and purchasing additional property if funds were available. S.Rep. No. 103–266, at 8–9 (letter noting that annual Bureau appropriations for land purchases for all tribes averaged only $1.1 million); H.Rep. No. 103–620, at 9–10 (same); *cf. Sault Ste. Marie Tribe of Lake Superior Chippewa Indians v. United States,* 78 F.Supp.2d 699, 704–05 (W.D.Mich.1999) (holding that the Secretary's mandate to acquire land in trust for

another tribe was not "unlimited as to duration and amount" where the tribe had to supply funding and find willing sellers), *remanded on other grounds,* 9 Fed.Appx. 457, 2001 WL 549409 (6th Cir.2001). Even the Eighth Circuit's *South Dakota* decision recognized acquiring land for new reservations as a legitimate and specific purpose. *South Dakota,* 69 F.3d at 882–83 & n. 3 (objecting to § 5 of the Indian Reorganization Act because it did not limit land acquisitions to such purposes); *see also United States v. Roberts,* 185 F.3d 1125, 1136–37 (10th Cir.1999) (upholding IRA § 5); *City of Sault Ste. Marie v. Andrus,* 458 F.Supp. 465, 473 (D.D.C.1978) (same). Thus, because the Pokagon restoration act establishes the Secretary's duty to place land in trust within the geographic and policy limits set by Congress, it does not violate the nondelegation doctrine. *Mistretta v. United States,* 488 U.S. 361, 372–73, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989) (delegations must "clearly delineate[ ] the general policy, the public agency which is to apply it, and the boundaries of the delegated authority" (internal quotations and citations omitted)).

**C. IGRA Claims**

■ Defendants are also entitled to summary judgment on the plaintiff's claims that taking the land in trust is unlawful because gaming on the site would be unlawful. Specifically, TOMAC has asserted (in Count One) that the Secretary violated the APA by taking land in trust for an illegal purpose (gambling without a valid gaming compact) and (in Count Four) that she violated the APA by failing to comply with certain procedures mandated under IGRA.

As to the first of these APA/IGRA claims, however, a gaming compact is not required for bingo and other class II gambling. 25 U.S.C. § 2710(b)(1). And even

for slot machines and other Class III gaming, there is no requirement that a compact be secured before a tribe may obtain a casino site. *Id.* § 2710(d)(1); *Kansas v. United States,* 249 F.3d 1213, 1223–24 (10th Cir.2001); *Match–E–Be–Nash–She–Wish Band of Pottawatomi Indians v. Engler,* 173 F.Supp.2d 725, 727 (W.D.Mich. 2001). In fact, a tribe gains authority to compel a state to negotiate concerning Class III gaming only *after* it has obtained "Indian lands" suitable for a casino site. *Engler,* 173 F.Supp.2d at 727.

■ As for the alleged failure to comply with IGRA procedures (Count Four), 25 U.S.C. § 2719 generally prohibits gaming on trust lands acquired by the Secretary after October 17, 1988, unless certain exceptions apply. The defendants assert that the Pokagon casino fits within an exception for "the restoration of lands for an Indian tribe that is restored to Federal recognition." 25 U.S.C. § 2719(b)(1)(B)(iii). Plaintiff argues that the Pokagon do not meet the technical definition of "restored tribe," and that gaming would be illegal on trust lands unless they comply with a different exception requiring the Secretary and the Governor of Michigan to conclude that gaming would be in the best interest of the Pokagon and would not be detrimental to the surrounding community. *Id.* § 2719(b)(1)(A).

TOMAC's argument is that "restored to Federal recognition" has a special meaning within Indian law, reserved exclusively for tribes whose federal recognition was terminated by congressional action. It emphasizes that the Pokagon restoration act states that "[f]ederal recognition of the Pokagon Band of Potawatomi Indians is hereby *affirmed,*" 25 U.S.C. § 1300j–1 (emphasis added), not *reaffirmed.* These points are not convincing. Congress often uses "restore" and "restoration" interchangeably with "reaffirm" and "recog-

nize" in confirming the status of tribes whose previous dealings with the United States government was terminated by administrative action. *Sault Ste. Marie Tribe of Lake Superior Chippewa Indians v. United States,* 78 F.Supp.2d 699, 705–07 (W.D.Mich.1999), *remanded on other grounds,* 9 Fed.Appx. 457, 2001 WL 549409 (6th Cir.2001); *Grand Traverse Band of Ottawa & Chippewa Indians v. United States Attorney,* 46 F.Supp.2d 689, 696–99 (W.D.Mich.1999); *see also Confederated Tribes of Coos, Lower Umpqua & Siuslaw Indians v. Babbitt,* 116 F.Supp.2d 155, 163–64 (D.D.C.2000) (concerning definition of "restored lands").

In this case, the title of the Pokagon legislation is "An Act to *restore* Federal services to the Pokagon Band of Potawatomi Indians," Pub.L. No. 103–323, 108 Stat. 2152 (1994) (emphasis added), and both the Senate and House committee reports state that the act is designed to *"reaffirm* the federal relationship between the United States and the Pokagon Band." H.R.Rep. No. 103–620, at 1 (1994) (emphasis added); *see also* S.Rep. No. 103–266, at 1 ("to *reaffirm* and clarify the federal relationship of the Pokagon Band" (emphasis added)). The statutory findings and legislative history repeatedly emphasize that the U.S. Government has dealt continuously with the recognized leaders of the Band since 1795, and that it has concluded numerous treaties with the Pokagon or their political predecessors, despite the fact that the Department of Interior prevented the Pokagon from organizing pursuant to the Indian Reorganization Act of 1934. 25 U.S.C. § 1300j; S.Rep. No. 103–266 at 1–4; H.R.Rep. No. 103–620 at 1–5. The Senate report provides a particularly strong statement of legislative intent:

The Committee concludes that the Band was not terminated through an act of the Congress, but rather *the Pokagon Band was unfairly terminated as a re-*

*sult of both faulty and inconsistent administrative decisions contrary to the intent of the Congress, federal Indian law and the trust responsibility of the United States.* In recommending the *legislative reaffirmation* and clarification of the federal relationship of the Pokagon Band, the Committee strongly affirms that the trust responsibility [of] the United States is not predicated on the availability of appropriated funds. Further, the possession of a tribal land base is not the foundation for determining tribal status.

Documentation submitted to and testimony presented before the Committee has confirmed that the Pokagon Band has been continuously recognized as a viable tribal political entity. The Band's claim of rights and status as a treaty-based tribe, and the need to *restore and clarify* that status, has been clearly demonstrated.

S.Rep. No. 103–266 at 6 (emphasis added).

Although the plaintiff places great weight on a report by dissenting House committee members who argued that "restored" status and "restoration" legislation are only available to tribes whose previous recognition was terminated by statute or treaty, H.R.Rep. No. 103–620 at 11–30, the minority report is entitled to limited weight. More recent court decisions have concluded that administratively terminated tribes can be "restored" by subsequent congressional *or* administrative action. *Sault Ste. Marie Tribe,* 78 F.Supp.2d at 707; *Grand Traverse Band,* 46 F.Supp.2d at 699.[8] I conclude that the taking of land in trust pursuant to the Pokagon restoration act qualifies as the "restoration of lands for an Indian tribe that is restored to Federal recognition" under IGRA. 25 U.S.C. § 2179(b)(1)(B)(iii).

## II. Rule 56(f) Motion

TOMAC's motion for discovery under Fed.R.Civ.P. 56(f) will also be denied. Judicial review of agency decisions is limited to the administrative record compiled by the agency at the time of decision except (1) where the agency has engaged in improper or bad faith behavior, or (2) where the record is so limited that it precludes effective judicial review. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); *Saratoga Dev. Corp. v. United States,* 21 F.3d 445, 457–58 (D.C.Cir.1994). The plaintiff has not made a "substantial showing" that the record is incomplete, *Natural Resources Defense Council, Inc. v. Train,* 519 F.2d 287, 291 (D.C.Cir.1975), or a "strong showing of bad faith or improper behavior" by the

---

**8.** In *Grand Traverse Band,* Judge Hillman emphasized that IGRA creates exceptions both for lands taken into trust as "the initial reservation of an Indian tribe acknowledged by the Secretary under the Federal acknowledgment process" and as "part of the restoration of lands for an Indian tribe that is restored to Federal recognition." 25 U.S.C. § 2719(b)(1)(B)(ii), (iii). He reasoned that both exceptions serve a similar purpose: "to place tribes belatedly acknowledged or restored in the same or similar position as tribes recognized by the United States earlier in their history." *Grand Traverse Band,* 46 F.Supp.2d at 698. Moreover, there may be some overlap between the two categories: "Acknowledgment is a specifically defined term under the IGRA, because the statute expressly references a federal administrative process, 25 C.F.R. Part 83, by which the agency acknowledges the historical existence of a tribe. In contrast, a tribe is 'restored' when its prior recognition has been taken away and later restored." *Id.* at 699.

In the Pokagon's case, TOMAC has presented no evidence indicating that Congress intended to exempt the Band from IGRA's general framework. When Congress intends to prohibit a tribe from gaming activity, it says so affirmatively. *See, e.g.,* Catawba Indian Tribe of South Carolina Land Claims Settlement Act of 1993, Pub.L. No. 103–116, § 14, 107 Stat. 1118, 1136 (1993).

Bureau. *Overton Park,* 401 U.S. at 420, 91 S.Ct. 814.

■ As to the completeness of the record, despite the plaintiff's assertion that the certification statement is deliberately vague and inconclusive, Ms. Selwyn does in fact state that, to the best of her knowledge, "the documents filed with the Court and served on counsel of record in this matter constitute a true, correct, and complete copy of the administrative record in this action." Pl. 56(f) motion, Ex. B. The fact that the defendants have supplemented the record with approximately 70 pages of additional information does not raise significant questions as to the completeness of the record, particularly when the supplementary material is accompanied by affidavits stating that searches were completed to ensure that no additional documents were omitted.

TOMAC erroneously asserts that all other federal agencies involved in the decisionmaking process are required to turn over all relevant information in their own files. *Saratoga Dev. Corp.,* 21 F.3d at 457 (holding that information compiled by other agencies but never submitted to the decisionmaking agency is not part of the administrative record). Its argument concerning additional information obtained through a Freedom of Information Act request is also unpersuasive. The fact that TOMAC has identified three documents that it asserts should have been included in the administrative record—among 5,000 pages of information obtained through FOIA—is not strong evidence of bad faith or an incomplete record. Pl. 56(f) Reply, Exh. A–C. Finally, plaintiff's argument that working edits should have been included in the administrative record

appears to confuse the administrative record—the record the agency relied upon in its final action—with FOIA's emphasis on every scrap of paper that could or might have been created. *Center for Auto Safety v. Federal Hwy. Admin.,* 956 F.2d 309, 314 (D.C.Cir.1992).

Plaintiff's assertions of bad faith in the initial decisionmaking process and the conduct of litigation do not constitute a "strong showing" sufficient to overcome the presumption of administrative regularity and good faith and to justify extra-record review and discovery. *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415, 420, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). The fact that some Bureau officials are being investigated for their dealings with other tribes is of no moment.[9] The fact that the Bureau made its decision in an apparently rushed fashion may be an indication of arbitrary and capricious action, but it does not indicate bad faith or misbehavior. The fact that third parties not before the court (the Pokagon as private land owners) have engaged in minor preliminary site work cannot be imputed to the Bureau.

As to TOMAC's assertions that the defendants have submitted extra-record evidence in support of their motion to dismiss or in the alternative for summary judgment, the affidavit of Herb Nelson will not be considered. Two other documents are in fact part of the record, but have been withheld from production on a claim of privilege. The Court will review them in camera.

### III. Venue

■ Defendants' motion to transfer this case to the Western District of Michi-

---

9. Leave will be granted to file (under seal) a February 2002 Department of Interior Office of Inspector General investigative report of allegations involving irregularities in the tribal recognition process and concerns related to Indian gaming. Plaintiff acknowledges, however, that that report does not directly address the Pokagon land in trust decision. Pl.Supp. Br. at 5.

gan will be denied. 28 U.S.C. § 1404(a). In an administrative case, the convenience of witnesses is a relatively minor concern and the defendants have already largely waived their own convenience concerns by filing the motion to dismiss or in the alternative for summary judgment. *The Wilderness Soc. v. Babbitt,* 104 F.Supp.2d 10, 15 (D.D.C.2000). Plaintiff's choice of forum is still entitled to some weight, even plaintiff chooses to litigate in a forum in which it does not reside. *Jackson v. District of Columbia,* 89 F.Supp.2d 48 (D.D.C. 2000), *vacated in part on other grounds,* 254 F.3d 262 (D.C.Cir.2001); *Beals v. Sicpa Securink Corp.,* Civ. Nos. 92–1512, 92–2588, 93–0190, 1994 WL 236081, at *4–*5 (D.D.C. May 17, 1994). The interests of justice, efficiency, and fairness would not be served by transfer after this Court has invested significant time in the case.

### *ORDER*

For the reasons set forth in this accompanying memorandum, it is ____ this day of March 2002,

ORDERED that defendants' motion to transfer the case to the Western District of Michigan [# 14] is **denied.** And it is

FURTHER ORDERED that defendants' motion to dismiss [# 21] is **granted in part.** And it is

FURTHER ORDERED that plaintiff's motion to permit discovery [# 47] is **denied.** And it is

FURTHER ORDERED that defendants' motion for protective order [# 550] is **denied** as moot. And it is

FURTHER ORDERED that the parties appear ____, 2002, at ____ for oral argument on the remaining issues in the case.