[No. A107547. First Dist., Div. One. June 30, 2005.]

CHIP WORTHINGTON et al., Plaintiffs and Appellants, v.
CITY COUNCIL OF THE CITY OF ROHNERT PARK, Defendant and
Respondent.

COUNSEL

Henn, Etzel & Moore and John Douglas Moore for Plaintiffs and Appellants.

McDonough Holland & Allen, Michelle Kenyon; Olson, Hagel & Fishburn, Deborah B. Caplan, Richard C. Miadich and Erin V. Peth for Defendant and Respondent.

OPINION

**MARCHIANO, P. J.**—One of the oldest contracts between Native Americans and Europeans in the United States was Dutch representative Peter Minuit's purchase of Manhattan Island from "Indians" for 60 guilders worth of goods in 1626. The Dutch West India Company instructed its New Netherlands' representatives to pay something "therefor to their satisfaction" and to obtain a signed contract "signed by them in their manner."[1] Times change. Over 377 years later, Native Americans, in a reversal of roles, reached an agreement with city representatives that resulted in this litigation. The Federated Indians of the Graton Rancheria, a federally recognized Indian tribe (Tribe) announced plans to build a casino, 300-room hotel, spa and

---

[1] A. J. F. van Laer, translator, 1924, *Documents Relating to New Netherland 1624–1626*, pages 51–52 (in The Huntington Library, San Marino, California).

entertainment resort on land located west of the City of Rohnert Park (City).[2] When the City approved an agreement with the Tribe regarding potential local impacts of the proposed casino project, an individual and a citizens group filed a petition for writ of mandate to place a referendum on the ballot regarding the City's action.

The superior court denied the petition, stating that the City's agreement constituted an administrative act that merely pursued a plan adopted by a superior power. Plaintiffs appeal from that judgment. For reasons we explain below, we agree with the superior court and affirm.

## BACKGROUND

In order to set the events giving rise to this appeal in the appropriate legal context, we first summarize the federal regulatory scheme concerning gaming on Indian lands, then review the facts leading up to the superior court's judgment.

*Regulation of Indian Gaming*

Indian tribes have always held a special position in our society. "It must always be remembered that the various Indian tribes were once independent and sovereign nations, and that their claim to sovereignty long predates that of our own Government. . . . '[T]he relation of the Indian tribes living within the borders of the United States . . . [is] an anomalous one and of a complex character. . . . They were, and always have been, regarded as having a semi-independent position when they preserved their tribal relations; not as States, not as nations, not as possessed of the full attributes of sovereignty, but as a separate people, with the power of regulating their internal and social relations, and thus far not brought under the laws of the Union or of the State within whose limits they resided.' [Citation.]" (*McClanahan v. Arizona State Tax Comm'n* (1973) 411 U.S. 164, 172–173 [36 L.Ed.2d 129, 93 S.Ct. 1257], fns. omitted.)

■ In 1987, the United States Supreme Court rejected California's attempt to regulate gaming on Indian reservations. (*California v. Cabazon Band of Mission Indians* (1987) 480 U.S. 202 [94 L.Ed.2d 244, 107 S.Ct. 1083].) In response to that decision, Congress enacted the Indian Gaming Regulatory Act (IGRA), 25 Unites States Code section 2701 et seq., which authorized tribal gaming, but allowed states "some role in the regulation of Indian gaming."

---

[2] Following the convention used in the federal cases and statutes and the parties to this appeal, we refer to "Indian" tribes and "Indian gaming," rather than "Native American," for uniformity of reference.

(*Artichoke Joe's California Grand Casino v. Norton* (9th Cir. 2003) 353 F.3d 712, 715 (*Artichoke Joe's*).) The Senate Select Committee Report on IGRA stated the intent to "expressly preempt the field in the governance of gaming activities on Indian lands." (Sen. Rep. No. 100-446, 2d Sess. (1988), reprinted in 1988 U.S. Code Cong. & Admin. News, pp. 3071, 3076.)

Of the three classes of gaming authorized by IGRA, class III gaming, which includes "the types of high-stakes games usually associated with casino-style gambling, as well as slot machines," is the most heavily regulated. (*Artichoke Joe's, supra,* 353 F.3d 712, 715.) Among other requirements, class III gaming on Indian land is lawful only when located in a state that permits such gaming and only if the Secretary of the Interior has approved a tribal-state compact.[3] (*Artichoke Joe's,* at p. 715; 25 U.S.C. § 2710(d)(1)(A).) The IGRA provides for mediation if a state and tribe fail to reach agreement. (25 U.S.C. § 2710(d)(7)(A)–(B).)[4] "IGRA also imposes on states an obligation to conduct compact negotiations in good faith, 25 U.S.C. § 2710(d)(3)(A), and allows tribes to enforce that obligation in federal court [citation]." (*Artichoke Joe's, supra,* 353 F.3d at p. 716.)

Because California law prohibited class III gaming at the time the IGRA was enacted, California voters approved Proposition 1A, a constitutional amendment that authorized the Governor to negotiate such gaming compacts. (*Artichoke Joe's v. Norton* (E.D.Cal. 2002) 216 F.Supp.2d 1084, 1095–1096; Cal. Const., art. IV, § 19 subd. (f).)[5]

---

[3] 25 United States Code section 2710(d)(3)(C) provides for provisions that may be included in a tribal-state compact as provisions relating to: "(i) the application of the criminal and civil laws and regulations of the Indian tribe or the State that are directly related to, and necessary for, the licensing and regulation of such activity; [¶] (ii) the allocation of criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of such laws and regulations; [¶] (iii) the assessment by the State of such activities in such amounts as are necessary to defray the costs of regulating such activity; [¶] (iv) taxation by the Indian tribe of such activity in amounts comparable to amounts assessed by the State for comparable activities; [¶] (v) remedies for breach of contract; [¶] (vi) standards for the operation of such activity and maintenance of the gaming facility, including licensing; and [¶] (vii) any other subjects that are directly related to the operation of gaming activities."

[4] The United States Supreme Court has limited some provisions of the IGRA. For example, in *Seminole Tribe of Fla. v. Florida* (1996) 517 U.S. 44 [134 L.Ed.2d 252, 116 S.Ct. 1114], the court ruled that a provision of 25 United States Code section 2710(d)(7) that permits tribes to sue a state over a tribal-state compact in federal court violated the state's sovereign immunity.

[5] Proposition 1A provides: "Notwithstanding . . . any other provision of state law, the Governor is authorized to negotiate and conclude compacts, subject to ratification by the Legislature, for the operation of slot machines and for the conduct of lottery games and banking and percentage card games by federally recognized Indian tribes on Indian lands in California in accordance with federal law." (Cal. Const., art. IV, § 19 subd. (f).)

*Background of the City's MOU*

In this case, the Tribe is comprised of Coast Miwok and Southern Pomo Indians, whose aboriginal territory includes Marin and Sonoma Counties. In 2000, Congress enacted the Graton Rancheria Restoration Act, restoring the Tribe's sovereign status. (25 U.S.C. §§ 1300n, 1300n-2.) The same act of Congress allowed the Tribe to select land from its aboriginal territory to be accepted as a part of the Tribe's reservation. (25 U.S.C. § 1300n-3.)[6]

In August of 2003, the Tribe contacted the Rohnert Park City Council (City Counsel) to advise them that the Tribe had acquired an option to purchase 360 acres in its aboriginal territory, near the City's boundaries. The Tribe asked to meet with the City Council, "to discuss the establishment of our reservation and the development of a resort-hotel casino on the optioned property." The Tribe requested that the City authorize representatives to begin negotiating "on a government to government basis" the terms of an agreement to "insure that the proposed project benefits the City as well as the Tribe." An ad hoc committee authorized the mayor and a council member to meet with the Tribe.

The City Council held a public meeting on September 23, 2003 to discuss the proposed agreement with the Tribe. The proposal drew comment from many opponents as well as supporters of the casino project.

In October of 2003, the Tribe and the City entered into a lengthy memorandum of understanding (MOU). It provided that the Tribe intended to submit an application to the Secretary of the Interior, requesting the United States to take title to the property in trust for the Tribe, and make a determination that the land shall be eligible for gaming under the IGRA. The MOU recited that the Tribe wished to enter into a voluntary contractual arrangement with the City to make contributions and community investments to mitigate impacts of the casino project. The MOU provided for payments of over $200 million to the City over 20 years, considerably more than 60 guilders. It also provided for termination of the MOU if the land was not accepted in trust for the Tribe or if the tribal-state compact was terminated.

When the City Council passed resolution No. 2003–233 approving the MOU, plaintiffs Chip Worthington and the Referendum Committee sought to place a referendum on the ballot to compel submission of the issue to the voters. The City refused to place the matter on the ballot, and plaintiffs filed a petition for writ of mandate, seeking to submit the referendum petition to the voters or force repeal of the authorizing resolution.

---

[6] After selecting land, the Tribe may apply to the Secretary of the Interior for acceptance of the land into trust for its benefit. The law provides that the Secretary "shall accept" the land into trust. (25 U.S.C. § 1300n-3(a).)

The petition alleged that although the casino project is located in an unincorporated area of the county that is outside the City's boundary, it was within the planning area described in the City's general plan and was inconsistent with the Sonoma County general plan. The petition specifically targeted a provision on page 27 of the MOU that stated: "In consideration of the covenants of the Tribe as set forth in the MOU, the City agrees not to oppose any efforts by the Tribe to cause the Secretary to accept trust title to the Property for the benefit of the Tribe and to otherwise develop the Project." The MOU gave "specific examples of non-opposition," that included writing letters as requested by the Tribe in furtherance of the objectives of the MOU, scheduling meetings with the Tribe and taking "such other appropriate actions as the Tribe may reasonably request consistent with this Section relating to the efforts of the Tribe identified in this MOU."

After the matter was briefed and argued, the superior court entered judgment denying the writ and plaintiffs appealed.

## DISCUSSION

We emphasize that the issues to be determined in this appeal do not concern the wisdom of allowing Indian gaming in or near California cities or the advisability and ramifications of building a casino and resort complex at the designated location in Sonoma County. These actions undeniably raise emotional issues that have resulted in heated debate and political action throughout the state. (See, e.g., Institute of Governmental Studies, University of California, "Indian Gaming in California" <http:www.igs.berkeley.edu/library/htIndianGaming.htm> [as of June 30, 2005].) The only question resolved by this appeal is whether the City resolution adopting the MOU is subject to referendum.

Plaintiffs argue that the City made a legislative policy decision when it entered into the MOU and agreed not to oppose the casino plan. Plaintiffs contend that the lack of a tribal-state compact with the Governor or inclusion of the specified land into trust as a part of its reservation land precludes the City's claim that it was only following a plan already adopted by a superior power. As an additional ground for invalidating the MOU, plaintiffs argue that it requires actions that are inconsistent with the City's general plan.

The City maintains that it was not exercising legislative powers that are subject to referendum, but was merely engaged in an administrative function like any other contract negotiation process. It also contends that the area at issue is outside the City and it has no jurisdictional authority over such lands.

After reviewing the action taken by the City in light of the extensive regulation of Indian gaming, we conclude that the federal and state governments have sole authority to exercise legislative power in this area and that the City's actions were administrative and not subject to the referendum process.[7]

*Referendum Applicable Only to Legislative Acts*

The California Constitution, article 2, section 9, subdivision (a) provides: "The referendum is the power of the electors to approve or reject statutes or parts of statutes except urgency statutes, statutes calling elections, and statutes providing for tax levies or appropriations for usual current expenses of the State." Article 2, section 11, subdivision (a) of the Constitution provides: "Initiative and referendum powers may be exercised by the electors of each city or county under procedures that the Legislature shall provide."

■ It is the "duty of the courts to jealously guard" the people's rights of initiative and referendum. (*Martin v. Smith* (1959) 176 Cal.App.2d 115, 117 [1 Cal.Rptr. 307] (*Martin*).) But a fundamental principle of referendum law is that a referendum may be used to review only legislative acts and not executive or administrative acts of a local government. (*DeVita v. County of Napa* (1995) 9 Cal.4th 763, 775 [38 Cal.Rptr.2d 699, 889 P.2d 1019] (*DeVita*); *Wheelright v. County of Marin* (1970) 2 Cal.3d 448, 457 [85 Cal.Rptr. 809, 467 P.2d 537]; *City of San Diego v. Dunkl* (2001) 86 Cal.App.4th 384, 399 [103 Cal.Rptr.2d 269] (*Dunkl*).) "Legislative acts of a city which establish general policies and objectives, and the ways and means of accomplishing them, are subject to the referendum process." (*W. W. Dean & Associates v. City of South San Francisco* (1987) 190 Cal.App.3d 1368, 1374 [236 Cal.Rptr. 11] (*Dean*).)

The commonly stated test for determining whether a particular action is a legislative or an administrative act was set out in *Dunkl* as follows. "[W]e must apply the test well set out and explained in *Valentine v. Town of Ross* (1974) 39 Cal.App.3d 954, 957–958 [114 Cal.Rptr. 678]: 'The acts, ordinances and resolutions of a municipal governing body may, of course, be legislative in nature or they may be of an administrative or executive character. [Citation.] . . . [¶] Also well settled is the distinction between the exercise of local legislative power, and acts of an administrative nature. [¶] Following earlier authority, we said in *Martin* v. *Smith* [(1960)] 184 Cal.App.2d 571, 575 [7 Cal.Rptr. 725]: " ' "The power to be exercised is

---

[7] Because we uphold the judgment, we do not address the City's argument that the Tribe was a necessary party to the proceeding. We also do not discuss whether the referendum would interfere with the City's provision of core government services because our conclusion that the action taken was administrative completely disposes of the issues raised on appeal.

legislative in its nature if it prescribes a new policy or plan; whereas, it is administrative in its nature if it merely pursues a plan already adopted by the legislative body itself, or some power superior to it." ' " ' " (*Dunkl, supra,* 86 Cal.App.4th at p. 399, italics omitted.)[8]

When implementing a plan adopted by a superior power, a city acts in an administrative capacity. "Acts of a local governing body which, in a purely local context, would otherwise be legislative and subject to referendum may, however, become administrative 'in a situation in which the state's system of regulation over a matter of statewide concern is so pervasive as to convert the local legislative body into an administrative agent of the state.' " (*Yost v. Thomas* (1984) 36 Cal.3d 561, 570 [205 Cal.Rptr. 801, 685 P.2d 1152].) When a local government's discretion is "largely preempted" by statutory mandate its action is administrative and not subject to referendum. (*DeVita, supra,* 9 Cal.4th 763, 776.)

When a local government implements federal policy, "pursuant to a comprehensive plan of federal regulations governing matters of national concern, its actions are administrative and not subject to local referendum." (*Dean, supra,* 190 Cal.App.3d at p. 1376 [concerning development plan formulated pursuant to federal Endangered Species Act (16 U.S.C. § 1531 et seq.)].) As noted above, by enacting IGRA, Congress intended to preempt the field of Indian gaming and delineate a narrow role for the states in negotiating tribal-state compacts that is only triggered by the request of a tribe. (*Artichoke Joe's, supra,* 353 F.3d at p. 715; Sen. Rep. No. 100-446, 2d Sess. (1988), reprinted in 1988 U.S. Code Cong. & Admin. News, pp. 3071, 3076.)

Absent a request by a tribe, even the state does not have the power to influence class III Indian gaming. A state is not required to agree to a compact, but may enter what is otherwise a preempted field if the state follows the provisions of IGRA. (25 U.S.C. § 2710 (d)(7)(B) [vi], [vii].) If a state refuses to participate, it loses its ability to influence the terms upon which Indian gaming occurs in the state. (25 U.S.C. § 2710 (d)(7)(B) [vii] [if state does not consent to proposed compact, Secretary of the Interior shall prescribe terms].) In California, the power to negotiate the tribal-state compact is specifically granted to the Governor.

---

[8] Some examples of measures that have been held not subject to referendum include: "acquisition of property for municipal purposes; urban renewal; change of ward boundary lines; change of power of appointment to office; authorization of a lighting system; street improvement; adoption of a historic district ordinance pursuant to statute; debts incurred for certain purposes; authorization of a supplemental appropriation; authorization of a tax levy; discontinuance of use of land for a park; increasing the number of hydrants; spending and procedural restrictions on planning and implementation process for new city facilities; change of the expense factor in the operation of a municipally owned utility; jitney service; and forbidding animals from running at large." (5 McQuillin, Municipal Corporations (3d ed. 2004) § 16:57, pp. 437–438.)

*Actions Taken by the City in This Case Are Administrative*

In this case, the City argues that it was acting in its administrative capacity in negotiating a contract, much like it would when negotiating contracts for road construction, wastewater treatment or any number of City services contracts. Plaintiffs argue that the City made a policy decision to give up the right to oppose the casino development and the voters should have the opportunity to review that decision. They argue that other local governments have made the policy choice to oppose Indian casinos or negotiate to apply local land use regulations which would otherwise be preempted. (Citing as examples: *City of Roseville v. Norton* (D.D.C. 2002) 219 F.Supp.2d 130, 136 [Placer County and tribe agreed tribe would comply with the California Environmental Quality Act, city and private individuals unsuccessfully challenged federal decision to take land into trust], affd. (D.C.Cir. 2003) 358 U.S. App.D.C. 282 [348 F.3d 1020] (*Roseville*); and *TOMAC v. Norton* (D.D.C. 2002), 193 F.Supp.2d 182, 191–194 [taxpayer group sought more detailed environmental analysis of Indian casino plan; court found assessment under National Environmental Policy Act sufficient].)[9]

Plaintiffs argue that the decision to negotiate with the Tribe rather than publicly oppose the casino plan is a policy decision. Use of the word "policy" to indicate that a decision is subject to the referendum power is inaccurate. "Policy" is a broad term that is not synonymous with legislation. Merriam-Webster's Collegiate Dictionary defines policy in the broad sense as: "Prudence or wisdom in the management of affairs." (Merriam-Webster's Collegiate Dict. (10th ed. 2001) p. 898.) Black's Law Dictionary defines "policy" as: "The general principles by which a government is guided in its management of public affairs." (Black's Law Dict. (7th ed. 1999) p. 1178, col. 1.)

■  That a city's action embodies what might be called a policy decision, in the sense that it represents a general guide in management of city affairs, does not make the act legislative in nature. By definition, a legislative act necessarily involves more than a mere statement of policy. It carries the implication of an ability to compel compliance. For example, Black's Law Dictionary defines "legislate" as: "To make or enact laws." The "legislative power" is: "The power to make laws and to alter them . . . ; a legislative body's exclusive authority to make, amend, and repeal laws." (Black's Law Dict. (7th ed. 1999) pp. 910, col. 1, 911, col. 2.) In an earlier version of

[9] Plaintiffs address the wrong question when they argue that "no superior law forbids local government from opposing casinos." The relevant question in this case is not whether the City could have voiced opposition, but whether the action actually taken by the City prescribes a new policy or plan and the means to carry it out (is a legislative act) or merely pursues a plan already adopted by a superior power (is an administrative act). (See, e.g., 5 McQuillin, Municipal Corporations (3d ed. 2004) § 16:54, pp. 407–410.)

Black's Law Dictionary, a part of the definition of the word "law" itself was stated as: "That which must be obeyed and followed by citizens, subject to sanctions or legal consequences." (Black's Law Dict. (4th ed. 1968) p. 1028, col. 1.) "The body of rules, whether proceeding from formal enactment or from custom, which a particular state or community recognizes as binding on its members or subjects." (8 Oxford English Dict. (2d ed. 1989) p. 712, col. 1.) [defining "law"].)

Thus, a city might make a statement describing a policy, but without the power to enforce or require compliance, it is not an exercise of legislative power. "[T]he reserved powers of initiative and referendum do not encompass all possible actions of a legislative body. Those powers are limited, under [California Constitution,] article II, to the adoption or rejection of 'statutes.' As we shall explain, it does not include a resolution which merely expresses the wishes of the enacting body, whether that expression is purely precatory or serves as one step in a process which may lead to a federal constitutional amendment." (*American Federation of Labor v. Eu* (1984) 36 Cal.3d 687, 708 [206 Cal.Rptr. 89, 686 P.2d 609].) A governmental entity legislates when it unilaterally regulates, or in addition to declaring a public purpose, makes provisions for the " 'ways and means of its accomplishment.' " (*Id.,* at p. 712, fn. 23; see also *Schloss v. City of Indianapolis* (1990) 553 N.E.2d 1204, 1207–1208; *Taxpayers of Michigan Against Casinos v. State* (2004) 471 Mich. 306 [685 N.W.2d 221, 226]. When an action requires the consent of the governmental entity and another party, the action is contractual or administrative. The give-and-take involved when a government entity negotiates an agreement with a sovereign Indian tribe is not legislation, but is a process requiring the consent of both contracting parties. (*Michigan, supra,* 685 N.W.2d at p. 226; *City of Owensboro v. Top Vision Cable Co. of Ky.* (1972) 487 S.W.2d 283, 287.)

■ The MOU in this case addresses mitigation of potential impacts of the future casino project; it does not state a policy of constructing casinos on county land or decide whether or how the casino project should proceed. (*Dunkl, supra,* 86 Cal.App.4th at pp. 400–401.) The MOU sets out no rule and contains no regulatory provisions. It is a contract, not a law. The fundamental policy decision and regulation of the location of tribal land and its use for a casino is made, not by the local government, but by the Tribe and the federal authorities. Whether a local government approves or chooses to voice its disapproval is not legislation and therefore is not subject to referendum.

*Other Cases Involving Contracts Are Distinguishable*

Plaintiffs rely in part on *Martin, supra,* 176 Cal.App.2d 115, 119 and *Empire Waste Management v. Town of Windsor* (1998) 67 Cal.App.4th 714

[79 Cal.Rptr.2d 262] (*Empire*), to argue that the MOU with the Tribe is a contract and that contracts may be subject to referendum.

Those cases are distinguishable. They did not concern dealings with sovereign entities, nor did they address the issues raised in this appeal. In *Martin*, the court did not resolve the issue of whether a lease to a private party was subject to referendum. In *Empire*, the court upheld a referendum on a local municipality's approval of the extension of a solid waste franchise.

*Martin* involved a challenge to a city's resolution extending a sublease that contemplated construction of a restaurant, bar, motel, and other concessions on tidelands granted to the city by the State Lands Commission. (*Martin, supra*, 176 Cal.App.2d at p. 116.) The court assumed, without deciding, that a prior resolution extending the lease was subject to referendum in order to determine whether a second enactment was the same as the act against which the referendum was filed. (*Id.* at p. 118.) *Martin* sheds no light on the applicability of the referendum to the MOU in this case.

*Empire* involved a provision of the Public Resources Code empowering the local government to grant an exclusive franchise for solid waste handling services. A franchise granted by local government, "ordinarily refers to such services and functions as government itself is obligated to furnish to its citizens and usually concerns such matters of vital public interest as water, gas, electricity or telephone services, and the right to use the public streets and ways to bring them to the general public." (*Copt-Air v. City of San Diego* (1971) 15 Cal.App.3d 984, 988–989 [93 Cal.Rptr. 649].) The authority exercised by a local government when it grants a franchise to a private company is not necessarily the same power it uses when it negotiates a contract.[10]

The *Empire* case has little bearing on the issues to be resolved in this case. The MOU grants no privilege nor does it obligate the Tribe to provide government services. The MOU in this case is not a franchise, but a contractual agreement between sovereign entities.

*The City Was Pursuing a Plan Adopted by a Superior Power*

Plaintiffs note that the Tribe has no tribal-state compact with the Governor and has not yet submitted the land to the Secretary of the Interior to take title

---

[10] The grant of a franchise may involve either legislative or contractual powers, depending on the facts of each case. "[W]here a municipality has both the power to contract as to rates and also the power to prescribe rates from time to time, if it exercises the power to contract, its power to regulate the rates during the period of the contract is thereby suspended, and the contract is binding." (*Louisiana-Pacific Corp. v. Humboldt Bay Mun. Water Dist.* (1982) 137 Cal.App.3d 152, 161 [186 Cal.Rptr. 833], italics omitted.)

to the property in trust for the Tribe. They contend that the absence of these prerequisites to class III gaming negates the argument that the City was merely implementing a plan already adopted by a superior legislative power.

Plaintiffs rely on *DeVita, supra,* 9 Cal.4th 763, 775–776 to argue that the presumption is against preemption of the referendum power and that this case lacks the necessary definite indication that a superior power intended to restrict that right. *DeVita* involved an initiative measure that amended a general plan. The Supreme Court noted that provisions of the Elections Code specifically recognized that general plans may be amended by initiative, and found no indication of legislative intent to exclude the voters from amending the general plan.

No statutory permission for action by referendum exists in this case. To the contrary, the extensive federal regulation of Indian gaming, the express statements of the senate committee regarding the intent of the IGRA, coupled with the Tribe's sovereign status confirm the existence of a clear intent to displace any local regulation.[11]

■ The mere fact that the Tribe negotiated with the City prior to negotiating a tribal-state compact or presenting the land for inclusion in trust as part of its reservation lands does not negate the extensive federal occupation of the field of gaming on Indian lands. Detailed provisions in the IGRA and the express statement of intent to preempt the field make it clear that any action taken by a City in response to a tribe's voluntary offer to negotiate is merely an aspect of the implementation of a general plan imposed by a superior power. We do not find that the timing of the Tribe's offer to negotiate with the City prior to committing itself to the specific location changes the nature of the City's action. (See, e.g., *TOMAC v. Norton, supra,* 193 F.Supp.2d 182, 193 [no requirement that a compact be secured before a tribe may obtain casino site].) The Tribe's political decision to blunt preemptively opposition from neighbors does not convert the resulting MOU process into local legislation.

---

[11] The Governor may negotiate compacts that provide for negotiation of agreements with local government. (See, e.g., Gov. Code § 12012.45, subd. (b)(1)(C) that refers to: "execution of an intergovernmental agreement between a tribe and a county or city government negotiated pursuant to the express authority of, or as expressly referenced in, a tribal-state gaming compact or an amended tribal-state gaming compact.")

Although one provision of federal law requires the Secretary of the Interior to consult with state and local officials when determining that gaming on a particular site would not be detrimental, that provision does not apply to Indian lands that have been restored. (25 U.S.C. § 2719(b)(1); *Roseville, supra,* 348 F.3d 1020, 1032.)

*Impact on City's General Plan*

Plaintiffs argue that the MOU contemplates roadway and public safety improvements that are inconsistent with the City's general plan because the area where the casino project is planned is currently zoned as open space. Plaintiffs offer examples from the MOU of inconsistencies with the general plan, including payment for widening of roads and installation of a traffic light. According to plaintiffs, because the City and Sonoma County general plans do not contemplate a casino complex, the specified improvements are inconsistent with the general plan and therefore subject to referendum.

Plaintiffs argue that the City included the land in the "Planning Area" of its general plan with the designation of open space, so any other use conflicts with the City's general plan.[12] But the City's general plan recognizes that it "does not propose annexation of all land within the Planning Area, [and therefore] development on unincorporated land . . . will continue to be regulated by the County General Plan." The parties agree that the location of the contemplated casino project is outside the City limits. It is also outside the City's 20-year urban growth boundary and the City's designated "sphere of influence." The land is in an unincorporated area of Sonoma County where plaintiffs concede Sonoma County has regulatory authority on the subject land.

The provisions of the MOU identified by plaintiffs are not contrary to the general plan because the MOU expressly provides that the City is not required to extend any infrastructure and that if future improvements are necessary, additional reviews and approvals may be required. In light of the location of the proposed project and the preliminary status of the actions contemplated by the MOU, no inconsistency with the general plan is shown.

The City's action in negotiating with the Tribe concerns matters that are regulated solely by federal law, carving out only a carefully delineated role for the Governor. The City has merely bargained for some benefit for the community, it has not legislated in this highly regulated field. Consequently, its action is not subject to the referendum process.

---

[12] The nature of the general plan and its coverage and intent were the subject of competing expert declarations in the trial court.

## CONCLUSION

The judgment of the trial court is affirmed.[13]

Swager, J., and Margulies, J., concurred.

---

[13] The City's motion for production of additional evidence on appeal, or in the alternative, request for judicial notice of a memorandum of understanding between the County of Sonoma and the Tribe as well as specified postjudgment events is denied. The materials were not before the superior court and are not necessary for our determination of the issues raised on appeal.